Robbery, ten years.
The evidence presented at trial is as follows:
Karen Dowdey Bater was employed by her father at the Treadco Tire Company, 4341 Morris Avenue in Birmingham, Jefferson County, Alabama. On October 22, 1976, she had gone to the bank to pick up the company's cash payroll. After obtaining twenty-four hundred dollars, which was packaged in a brown paper sack, she drove back to the tire company. On her arrival, at approximately 12:10 P.M., she drove into the parking lot to park her car. At that moment, a green Chevrolet, with two black males in it pulled up beside her. The occupants of the car asked her whether this was the place at which they could purchase used tires. She replied "yes," and they then drove their car to the opposite side of the street, where they parked it.
Ms. Bater, by that time, had left her car and, as she approached the tire company building, one of the occupants of the car "ran up" behind her and grabbed the sack containing the money. According to Bater, she held onto the sack and would not let go and, as a result, was thrown around by the robber. However, she said that, when she saw that her assailant had a gun, she let go of the sack and he "ran west down Morris" Avenue. She stated that the car with the other person in it drove in the opposite direction on Morris Avenue.
The prosecuting attorney then asked Ms. Bater if she saw either of the men in the courtroom. And, at that point, defense counsel objected, and requested that he be allowed to question the witness on voir dire, out of the presence of the jury. The jury was excused from the courtroom and a voir dire examination of Ms. Bater was begun.
She stated that she was shown a group of eight colored photographs which included the picture of the appellant, who was the driver of the car, and the other man, Willie Frank Watkins, who had actually taken the money. She described the appellant, Curtis Webber, as being "lighter complected" than the other man, and as having "a medium Afro." She stated that he was "around six feet and around 170 pounds."
Further, she said she had seen both men while they were sitting in their car and that they had appeared to be about the same height. She also said that they both had on "white shirts" and that the appellant had on a "white . . . shiny silky looking [shirt] and a tan jacket."
According to Ms. Bater, she was alone when she viewed the photographs, and she had identified pictures of the appellant, Curtis Webber, and Willie Frank Watkins at that time. Further, she said that, when she picked out the pictures, she told the detective that "[t]hose were the two men that robbed me." She also stated that she did not request to view a lineup, but that the officer had made the request. She testified that, around November 17th or 18th, she viewed a lineup and, at that time, identified Watkins. She said that she viewed another lineup in December and, at that time, identified Webber.
She testified that she had had the opportunity to look at both men for about "ten or fifteen seconds," in the parking lot prior to the robbery.
Officer Johnny C. Woods of the Birmingham Police Department was called next and was examined on voir dire, out of the presence of the jury. He testified that, after viewing the photographs and choosing the appellant's picture, Ms. Bater stated, "this looks like the man." He said that she also made the same statement when she picked out Watkins' picture.
According to Woods, Officer B.R. Moore had taken the appellant into custody and subsequently returned him to the Treadco Tire Company. Woods said that the appellant was apprehended near his residence, which was some two and one-half blocks from the tire company.
At the end of Officer Woods' testimony, Mr. Wendell P. Dowdey, the owner of Treadco Tire Company, was called to the stand and testified that, subsequent to the robbery, he was taken by police to an area *Page 1120 
"some block and a half from" the tire company building and was shown a black man in a car. He stated that, at that time, he did not know there was more than one man involved in the robbery and he had told the officer that the man in the car was not the person whom he had seen robbing the tire company. At trial Dowdey said he could not swear that the man he saw in the car was the appellant.
At the completion of Mr. Dowdey's testimony, Ms. Bater was recalled, and gave the following testimony before the jury: She identified the appellant as the driver of the other car on the occasion when she was robbed. She pointed to the appellant, Curtis Webber, and testified that he was the driver of the car that "pulled up beside" her car before the robbery, and that Willie Frank Watkins was the passenger in that car. Further, she stated that Watkins was the one who followed her to the building and actually robbed her.
According to Bater, at the time Watkins took the sack, she began to scream, "Daddy, he got it." She said the appellant's car was "in the middle of the street," at that point, and that, when she began to scream, the car "headed East down Morris" Avenue. She testified that Watkins then ran in the opposite direction on Morris Avenue.
Ms. Bater testified that twenty-four hundred dollars in United States currency was taken from her by Watkins. Bater said that, when they questioned her concerning buying used tires, the two men were looking at her. She said that afterwards, Watkins had come toward her "as though he was really going to open the door and that's when he grabbed the sack."
According to Bater, after the robbery, she ran to the office to tell her mother to call the police as her father and Phillip Tidwell ran out of the door to try to apprehend the robbers.
During cross-examination, Ms. Bater testified that she had gone to the bank about 11:50 A.M. and returned with the money in a brown paper bag. She acknowledged that she had not seen the green Chevrolet in question at the bank or on the way back from the bank. She also said she had not seen the appellant (Webber) in the bank, nor did she remember whether the car had a "loud muffler."
Bater testified that the first knowledge she had of the car was when it "pulled up beside" her in the tire company's parking lot and the two occupants made the inquiry concerning whether or not they could purchase used tires there. Further, she said that she had looked at the car first, before anything was said. According to the witness, after she responded to their question, she watched the car "back up."
Ms. Bater acknowledged that the man "reached around and took the money." She said that he came "[r]ight from behind me and grabbed it, yes sir." She testified that the money was in a "brown paper sack" at the time it was taken and that she saw her assailant produce a pistol from the "right hand pocket" of his "light windbreaker type jacket."
Further, she said that the car pulled in front of the tire company building during the time she was struggling with the assailant. She stated that she did not know at what point during the struggle the car had left and acknowledged that the car "took off at a fast rate of speed down Morris Avenue." Further, she again acknowledged that she had had an opportunity to look at the two individuals for about ten or fifteen seconds and said she did not see the man who was driving the car again until she saw his picture in the photographic lineup.
Further, she said that she had given Officer Moore a description of her assailant and the person driving the car. She testified that she had described the passenger in the car (the appellant) as being approximately five feet and ten inches tall and weighing around one hundred and fifty pounds. Further, she described his hair as "a medium Afro," and stated that he had "medium to dark complexion" and was wearing a white shirt and a tan jacket.
Ms. Bater stated that she told Officer Moore that the driver was "a little taller" *Page 1121 
and "a little heavier looking . . . around a hundred and seventy pounds, with a white silky looking shirt on, medium Afro and light complexion."
Bater also said that, when she talked with the police dispatcher over the telephone, she gave her a description of the car the two men had been driving. However, she was unable to remember whether or not she had told Officer Moore that the driver of the car was wearing a hat.
During re-direct examination, Ms. Bater testified that she had been picking up the payroll for the tire company for "about a year and a half" and had used the same bank during that time. Further, she said that she was in the habit of leaving and returning at approximately the same time.
Ms. Bater stated that she had given Officer Moore the description of the two men no later than 1:00 o'clock on the same afternoon.
James Phillip Tidwell testified that, on October 22, 1976, he was employed at the Treadco Tire Company. He stated that, approximately 11:30 A.M., he left for lunch in his motor vehicle.
At that point, Tidwell's testimony was interrupted and a voir dire examination was conducted by the defense attorney out of the presence of the jury. Tidwell there testified that, as he was leaving for lunch, he saw the appellant, whom he identified in court, drive up in an automobile with another man.
Tidwell gave the following account of the incident:
 "I was just leaving, pulling out the driveway out of that parking lot and the reason I observed him, he was turning into that lot and he jumped across the curb in his automobile. That was what drew my attention to him and he asked me `is this the place you can buy used tires?'"
Tidwell said that the driver of the car (the appellant) had asked the question and that he (Tidwell) had responded, "yes, sir." Tidwell described the car as a "bluish gray, '65, '66 or '67 Chevrolet, I'm not sure which one."
The witness stated that he was shown a group of pictures but did not remember whether he had identified anyone in the pictures. However, he said that he had viewed two different lineups and had identified the appellant or Watkins in each lineup.
Tidwell testified that, although he had seen the appellant for only a few seconds on the first occasion, he "saw him again later down the road after the robbery had taken place." When asked whether he was basing his identification on the fact he had seen the appellant again, Tidwell responded, "I guess so, I just remembered him." Further, Tidwell said that the view he had of the appellant, as he was being taken into custody and placed in a patrol car, was not much better than when he saw the appellant turn into the parking lot at Treadco Tire Company.
Tidwell also stated, "I wouldn't say that it was a clear image [of the appellant] no, sir, I just remember." He added that, when he saw the appellant after he was taken into custody, he "recognized him again." The witness said that he remembered telling the officers that the man whom he identified as the appellant had worn a "tan jacket" and that he remembered the automobile. Further, Tidwell said that, when he saw the appellant later, in custody, he had had on a "light jacket." He stated that, when informed by the police that the appellant had been released, "I told them I thought it was him."
Tidwell testified that he had given Sgt. Woods a description of the driver and had told him that the man had been wearing a light jacket. He stated that he did not remember the color of the shirt appellant was wearing or whether he had had a beard, mustache, goatee, long sideburns or scars on his face. He did remember that he had not been wearing a hat, however.
The witness was able to state the approximate time he had left for lunch, where he had gone, and how long he had stayed. He stated that he had returned before Ms. Bater. *Page 1122 
At the completion of Tidwell's testimony, the defense attorney made a motion to suppress the identification on the grounds that it was "tainted and suggestive . . ." Defense counsel argued, "I don't think he [Tidwell] can say what he's identifying today, whether it's the man he saw in custody or the man he saw drive into the parking lot." The motion was overruled and Mr. Tidwell began his testimony anew before the jury.
Tidwell's testimony before the jury was substantially that given outside their presence, with these additional facts: Tidwell testified that he returned from lunch "a few minutes after twelve" and went into the office of the Treadco Tire Company, "where Mr. Dowdey was." Tidwell said he was in the office for about five minutes when he heard Ms. Bater screaming near the front door of the office building. At that point, he and Dowdey "took off out the front door." He said he saw a "black male running toward the alley," whom he later learned was Willie Frank Watkins. Tidwell said that he did not see the appellant, Curtis Webber, or the bluish-gray Chevrolet in the area, at that time.
According to Tidwell, he and Dowdey chased Watkins and that, when Watkins entered the alley, he turned and Tidwell and Mr. Dowdey got into a car, drove west on Morris Avenue and made a turn on 42nd Street, where they saw Watkins again.
Tidwell testified that, when they saw Watkins approach the Chevrolet in which he and the appellant had been riding, Mr. Dowdey yelled, "hold it," and ran after Watkins. Tidwell said that he got out of the car and, when he was standing beside the car, he heard several shots being fired.
Tidwell added that, when he saw Watkins appear to enter the car, Watkins had the bag of money in his hand. Tidwell recalled that it was then that Mr. Dowdey had yelled "hold it," and that "then there was a gunshot fired." According to Tidwell, Watkins then ran between a couple of houses on 42nd Street with "Mr. Dowdey right behind him."
The witness said that he did not see the driver of the car at that time, and did not remember whether it was a man or woman or whether the driver was black or white.
During cross-examination, Tidwell stated that, when he heard Ms. Bater scream, he opened the office door and saw the man named Watkins running toward the alley. Tidwell said that, at that point, he and Mr. Dowdey "started chasing him," and that, when Watkins reached the alley, they stopped chasing him.
The witness added that they saw that Watkins had a gun but that Mr. Dowdey did not have a gun at that time. He stated that Ms. Bater handed her father a pistol later.
Further, Tidwell acknowledged that, when he and Dowdey drove up the street he saw the "green Chevrolet parked on the corner," but that he did not see the Chevrolet "driving up and down" the street. Tidwell also acknowledged that he saw the appellant in custody "after the green [Chevrolet] car took off." Tidwell said he did not "have a chance" to tell the police that the appellant was the one he had seen in the green Chevrolet earlier.
Tidwell said he did not remember whether the appellant had been wearing a green shirt at the time he was taken into custody by the police. He also testified that he didn't "really know" whether the appellant had had on green pants. Tidwell stated that "[a]fter it was all over during the questioning" was the first time he had told anyone that the appellant was the man whom he had seen in the green Chevrolet.
The witness acknowledged that he had talked with Ms. Bater about the robbery "since it happened," but denied that she had told him that the appellant was the one who was driving the car. On being asked whether he had told Ms. Bater that he thought the appellant was the one who was driving the car, Tidwell responded, "I don't think so, no, sir."
On further cross-examination, Tidwell said that he saw Watkins "grabbing at" the front door of the Chevrolet. He said, "I *Page 1123 
don't know what happened to the Chevrolet [after that]."
Tidwell testified that Mr. Dowdey continued chasing the man across 1st Avenue and that Tidwell left the car and started running "right behind Mr. Dowdey." Tidwell said that Watkins had a gun and was wearing a jacket.
Tidwell acknowledged that he heard Mr. Dowdey tell the police "that's not him," with reference to the appellant.
Tidwell stated, on further examination, that he had given the police a description of the driver of the car but that he did not remember "what description" he had given them. Tidwell said he did remember that the driver was wearing a "beige sort of tan jacket," and that the car was "a bluish gray, not green." Tidwell explained that he had told the police that the driver had on a "light jacket" but said, "I am sure I described him more than that, I just don't remember."
Wendell P. Dowdey, on October 22, 1976, was the owner and operator of the Treadco Tire Company, located at 4341 and 4347 Morris Avenue in Birmingham, Alabama. He recalled that, at approximately 12:00 o'clock on that date, he was in his office with Mr. Tidwell and heard his daughter scream. On hearing the scream, the two men ran out the door and Dowdey saw his daughter "getting up from the ground." He also "saw a man running across the street at an angle."
According to Dowdey, he chased the man but the robber "stopped . . . turned around and pulled a pistol." Dowdey then got his daughter's car keys and her gun and he and Mr. Tidwell drove down Morris Avenue. They saw the man once more "stopped by an automobile . . . kind of leaning in the window on the passenger's side" of the car.
Dowdey said that, after he and Tidwell turned the corner, where the car was parked, the man "started running" again and he (Dowdey) "shot into the air." The man "ran between some houses and . . behind a hedge and then shot at (Dowdey) as (Dowdey) came around the house through the hedge." He shot at Dowdey "three different times."
The witness said that, afterwards he lost sight of the man. Dowdey said he yelled to Tidwell to call the police and that, after several minutes, he saw the man run from another yard and start "running across 1st Avenue and on across the Airport Highway and into the housing project."
Dowdey said he continued to chase the man as long as he could but had to stop. He was subsequently picked up by a police car and, while in the car, he heard a radio report stating "that they were holding someone near Morris Avenue."
Dowdey said that the officer took him back to a location near Morris Avenue where he was asked to identify a man in the back seat of a patrol car, whom he did not recognize. The witness said he told the officers that "was not the man." Dowdey explained that, at that point, he did not know there were more than one person involved in the robbery, namely the man he had been chasing.
Dowdey said he could not identify the appellant as the man he saw in the patrol car but said that the man had been wearing a "white, silky looking shirt."
During cross-examination, Dowdey said he had looked at the man seated in the police car and knew it was not the man he had been chasing. He did say, however, that the appellant "looked like" the man who was in the back seat of the police car. Mr. Dowdey testified that he had discussed the case with his daughter, but said that he had no distinct memory of her having discussed what the driver of the car had been wearing. Further, he stated that he had not discussed the matter with Mr. Tidwell either.
Dowdey testified that the man in the back seat of the police car had not had a "full beard" but did have "a little bit of facial hair that looked as though someone might have been starting a beard, but a beard per se, no." Dowdey said that he was absolutely positive about the "white, silky shirt" that the man had been wearing. *Page 1124 
Further, he said that, when he saw the man in the patrol car, it was "at least a half a block, maybe more" from Treadco Tire Company.
Johnny C. Woods, a detective sergeant with the Birmingham Police Department assigned to the robbery division, was in charge of the investigation of the robbery of the Treadco Tire Company. He testified that he talked to Ms. Bater "the day after the robbery." Further, he identified the appellant in the courtroom and said he had seen the appellant on several occasions at his home. He explained that the appellant's home was "approximately two and a half blocks" from the Treadco Tire Company.
Woods also stated that he had gone to the appellant's house on November 10, 1976, but was unable to see the appellant. He said he went back again but that it was not until November 17th that he saw the appellant and arrested him for robbery. Woods also said that the appellant's appearance at the time of his arrest was the same as he appeared in court.
At this point in Mr. Woods' testimony, the jury was excused and a voir dire examination was conducted.
Sgt. Woods testified that, after he arrested the appellant, he informed him of his Miranda rights and that, before the appellant made a statement, (Woods) did not threaten, abuse, coerce or promise him any reward. Woods testified that he told the appellant he was charged with robbing the Treadco Tire Company and asked the appellant whether or not he was involved in the robbery. Woods stated that the appellant said he was not, but that he knew about it.
According to Woods, the appellant went on to say "that if he had said anything at all about it (the robbery at Treadco Tire Company) that he would have been repeating what someone else told him." Woods said that the appellant told him that "a man named Carter had done the robbery" and that the appellant agreed to show Woods where Carter lived.
Woods said the appellant had added "that Carter knew all about the place (Treadco Tire Company) and, in fact, [had] done the robbery and [appellant] had heard him bragging about it, and that any information [appellant] had about the robbery would have come from Carter."
Woods stated that the appellant showed him where Carter lived on the same afternoon the appellant was arrested. Woods said he went to Carter's residence and talked with Carter.
According to Woods, Carter was a shorter man than the appellant, "heavier, and somewhat the same general age," but, in Woods' opinion, Carter and the appellant did not "look anywhere near alike." Woods explained that Carter had "shorter hair" and his skin color was lighter than that of the appellant.
Woods then asked the appellant where he was on the day of the robbery and Appellant said that he remembered the date because that was the day "he was supposed to be in court." Further, the appellant explained that he was, in fact, on his way to court when he saw a patrol car near his residence. The appellant started running, but was apprehended by the police, who placed him in the police car. Appellant said he was carried in the police car to a location "where a man said that he wasn't the right one" and he was subsequently released by the police.
At that point, the jury was returned to the courtroom and Sgt. Woods was cross-examined by defense counsel. Woods stated that the police had not recovered the money taken in the robbery, or located the pistol or the "bluish-gray Chevrolet" alleged to have been used in the robbery.
Woods testified that he had talked with Mr. Tidwell on two occasions, on one of which he had carried some pictures for Tidwell to view. Woods stated that Tidwell did not identify anyone in the pictures he had shown him, but did identify Curtis Webber in a lineup. Further, he said that Ms. Bater also identified the appellant in a lineup. *Page 1125 
On further cross-examination, Woods testified that Ms. Bater made a tentative identification of the appellant from the photographic display. Woods stated that Tidwell had told him, on the day of the lineup at which he identified the appellant, that the appellant was the man driving the "bluish-gray Chevrolet."
Sgt. Woods testified that Watkins had also been arrested and charged with the robbery of Treadco Tire Company. Woods said that Watkins lived "approximately a block and a half" from the appellant's house. At the end of Sgt. Woods' testimony the State rested and the defense made a motion to exclude the State's evidence, alleging that there was "not enough evidence to connect this [appellant] with any robbery, no circumstances to show any conspiracy between [the appellant] and any other person to commit any robbery." The motion was overruled by the trial court. During his presentation of evidence, the appellant did not take the stand but called the following witnesses:
Jesse Webber, the appellant's father, recalled the day of the incident at the Treadco Tire Company because his sons had told him about it when he "got home that night." He also stated that, on the day of the incident, the appellant came to see him at work in order to get some money. According to Webber, the appellant had needed the money to pay a fine. Webber said, in his best judgment, his son had come to see him "about 11:30" A.M. and that he had later seen a receipt for a fine of forty-two dollars.
During cross-examination, Mr. Webber said that the appellant did not mention that he had been detained by the police prior to coming to his place of work. Webber also stated that he did not remember how his son was dressed on that occasion. Finally, Webber denied receiving any card from Sgt. Woods and said that he had not received anything from him.
Mac Parsons, an attorney, was practicing law in Birmingham, Jefferson County, Alabama in October of 1976. He recalled an incident when the appellant, Curtis Webber, was to meet him at the City Hall to pay a fine. According to Parsons, the Birmingham Recorder's Court, where they were to meet, began about 1:30 P.M. Parsons said the appellant did not arrive on time, and that, when he did, "his clothes and his appearance indicated that he had been in some sort of tussle."
Parsons said he did not know whether the appellant had mentioned the Treadco Tire Company, but that he did say that he had been on his way to court when the police "jumped on him."
During cross-examination, Mr. Parsons testified that the appellant told him the police had "grabbed" him and carried him to a place where "some people" had looked at him and said "no, he's not the one." Parsons said the appellant had told him that was the reason he was late. Parsons said the appellant told him that he had run from the police and that the reason he ran was that he thought the police were after him about coming to the city court. The appellant had thought that, if he could run away and get down to the court and pay the fine, everything would be taken care of.
According to Parsons, it was about 1:30 in the afternoon when he talked to the appellant, but he could not remember precisely the date.
Jesse Webber, the appellant's father, was recalled and testified that the appellant did not have a driver's license, nor did he own a car. Further, he said he had never seen his son drive a car before. On further cross-examination, Webber said that, after he gave the appellant the money at 11:30, his son had returned with the receipt in "about thirty minutes."
At the completion of Webber's testimony, the defense rested and the case was subsequently submitted to the jury.
 I
The appellant contends that there was a fatal variance between the allegations in the indictment and the State's proof at trial. He argues that the indictment states the amount of money which was taken, but *Page 1126 
does not specify the denominations of the currency. He maintains that the State failed to prove the allegation, "a more particular description and denomination of which is otherwise unknown. . . ." He also argues that the State failed to prove "whether the denomination was known or unknown." It is insisted that this failure of proof was "a fatal variance between the allegations in the indictment and the proof at trial."
There have been numerous decisions affirming the holding that an averment that the particular denominations of money are unknown to the grand jury is sufficient description. One of the oldest of these is Owens v. State, 104 Ala. 18, 16 So. 575. There, the Alabama Supreme Court cited Grant v. State, 55 Ala. 201, in which "the property was described as `three hundred and twenty dollars in national currency,' followed by an averment that the particular denomination was unknown to the grand jury, and it was held that the description was sufficient." See also,DeFranze v. State, 46 Ala. App. 283, 241 So.2d 125.
We note, however, that nowhere in the record has the appellant made any objection by way of demurrer or motion for a new trial concerning the description of the money. In the absence of a proper objection, a demurrer, or a motion for a new trial raising this point, appellant's plea of not guilty waived any defect appearing in the indictment. Waters v. State, Ala.Cr.App., 360 So.2d 358.
In view of the foregoing, it is our judgment that no defect in the description of the money is shown but, if there had been, the matter was not properly raised for review.
 II
It is contended that the in-court and out-of-court identifications of the appellant were improperly admitted. The appellant argues that, "from the totality of the circumstances surrounding the pretrial identification procedures, there existed a substantial likelihood of misidentification of [the appellant]" and that this denied him due process of law.
It is the appellant's contention that Officer Woods used a suggestive identification procedure to implant in the minds of the witnesses, Ms. Bater and Mr. Tidwell, whom they should identify as the driver of the automobile used in the robbery.
At the outset, we note that it is not unnatural for persons called to view a lineup to understand that the suspect is in the lineup, and the fact that they are told does not contaminate the proceedings. Fletcher v. State, Ala.Cr.App.,337 So.2d 58. In the present case, Officer Woods, at the conclusion of the photographic identification stated to Mr. Tidwell and Ms. Bater that "if he [the appellant] was picked up then a lineup would be held." This remark and the fact that Woods commented to Ms. Bater that she "could see him (Curtis Webber, the appellant) in a lineup or he would like for us both to" did not contaminate the proceeding.
We now turn to the determination of whether, under the "totality of the circumstances," the identification was impermissibly suggestive, creating a substantial likelihood of irreparable misidentification. Neil v. Biggers, 409 U.S. 188,93 S.Ct. 375, 34 L.Ed.2d 401.
First, Ms. Bater and Tidwell were able to observe the appellant around 11:30 A.M. on the day of the robbery. It was a clear day and nothing was shown to indicate that their view was obstructed or obscured. Also, at the separate times Ms. Bater and Mr. Tidwell responded to the appellant's questions, the appellant's car windows were open.
Ms. Bater testified that she had been able to view the appellant at close range for about fifteen seconds, and, although Tidwell's opportunity to view the appellant was limited to his brief confrontation with him in response to his question, Tidwell's attention was also called to the appellant because of the manner in which the appellant was driving. Finally, Tidwell stated that he recognized the appellant as the man driving the car in front of the Treadco Tire *Page 1127 
Company earlier in the day, and as the same person he saw in the back seat of the police car.
The degree of attention demonstrated by Ms. Bater and Mr. Tidwell in their observation of the appellant can be determined from the foregoing facts as well. Ms. Bater's and Mr. Tidwell's descriptions of the car were precisely the same and Ms. Bater's description of the appellant closely approximated his precise weight and height. In fact, during her testimony, Ms. Bater exhibited no hesitancy when identifying the appellant as the driver of the car.
Mr. Tidwell also displayed no hesitancy in identifying the appellant as the driver. In fact, he said several times that he remembered the tan or beige jacket appellant had been wearing. Mr. Tidwell explained that when the appellant was first apprehended he did not tell the officers that Webber was the one that he had seen in the green Chevrolet at the tire company because he "didn't have a chance."
Although Ms. Bater did express hesitancy in identifying the appellant from the photographic array, she made a positive identification of the appellant at a lineup. Each lineup was conducted without remarks from Officer Woods and, from what is shown in the record concerning the composition of the lineup, the participants closely resembled each other in size, age and race. Further, Officer Woods testified that he was very careful not to allow the witnesses to see a lineup sheet containing the appellant's address.
In our judgment, under the totality of the circumstances, the trial court's conclusion admitting the identification is supported by the record and was clearly proper.
 III
The appellant next complains that the proof offered by the State was insufficient to prove the appellant's complicity in the robbery and was therefore insufficient to present the issue of appellant's guilt to the jury.
Although mere presence in the automobile would not make the appellant a principal, other facts, such as his presence and connection with his companion and his conduct at, before and after the offense, are "potent circumstances from which participancy may be inferred." Smith v. State, 57 Ala. App. 151,326 So.2d 680.
In the present case, there was direct and circumstantial evidence tending to show appellant's participation in the robbery. Ms. Bater testified that around 12:00 o'clock noon, on the day of the robbery, the appellant asked her if this was the place where he could buy used tires. After she responded that it was, the appellant and his companion stopped their car in the middle of the street. At that point, the passenger jumped out and ran up behind Ms. Bater and took the sack containing the money.
Ms. Bater testified that the appellant waited in the car while the struggle was going on and, just before she released the sack with the money, the car sped away at a high rate of speed. Mr. Tidwell testified that he had seen the appellant driving the same bluish-green Chevrolet which Ms. Bater had identified earlier, into the Treadco Tire Company lot around 11:30 A.M. on the day of the robbery.
Although Ms. Bater could not say whether the appellant or the passenger had made the inquiry about buying used tires, Tidwell stated that it was the appellant who made the inquiry. Tidwell also said that he saw the appellant again in the police car and recognized him as the person who was driving the car which he had seen earlier. Tidwell also stated that, when he and Mr. Dowdey were chasing Watkins, the passenger who had actually perpetrated the robbery, he saw Watkins near the same car driven by the appellant earlier. Although Tidwell could not say that the appellant was driving the car at that time, the evidence was undisputed that the appellant was the driver of the car when it was first seen by Ms. Bater and Mr. Tidwell.
It is our judgment that the foregoing facts demonstrate sufficient evidence to submit the question of the appellant's complicity *Page 1128 
in the robbery to the jury, and the trial court was proper in overruling the appellant's motion to exclude the State's evidence. Smith v. State, supra; Bass v. State, 55 Ala. App. 5,312 So.2d 576.
 IV The appellant insists that the following statement by the prosecutor, made while the defense attorney was cross-examining the State's witness, was improper and shifted the burden of proof to the appellant. From the record:
"Q. He had on a green shirt at that point, didn't he?
"A. I don't remember.
"Q. You're not denying it are you?
"A. No, sir.
"Q. You don't remember.
 "MR. GOMANY: Judge, I hope he can — "Court Reporter's Note. At this point, Mr. Pickard, Mr. Gomany, and the Court were all speaking simultaneously making the record inaudible and incomplete at this point.
"MR. GOMANY: I hope he's got evidence to that.
"MR. PICKARD: I was going to ask a question.
"MR. GOMANY: Well, if he —
"THE COURT: Just a minute, Mr. Gomany.
"MR. PICKARD: Judge, I object and ask for a mistrial.
 "THE COURT: Just be quiet and you may get it if Mr. Gomany continues.
 "MR. GOMANY: Well, he's putting — he's asking questions — stating a fact.
 "THE COURT: This is cross-examination and I am allowing him to go into it, Mr. Gomany. Be careful.
 "MR. PICKARD: And, I do renew my objection for mistrial and I will state my grounds outside of the presence of the jury —
"THE COURT: Overruled.
 "MR. PICKARD: — for the position he's forced me into.
"(Continuing). He had on green pants, too, didn't he?
"A. I don't really know."
At the outset, we recognize, as the appellant has recognized in brief, that the remarks made were not made during closing argument and that there are a number of cases distinguishing between statements made during trial and statements made during closing argument. See Diamond v. State, 49 Ala. App. 68,268 So.2d 850.
There is no legal standard by which alleged prejudicial remarks of the prosecutor at trial can be gauged, and each case must be determined on its own merits. Beckley v. State, Ala.Cr.App., 335 So.2d 244; Smith v. State, 282 Ala. 268,210 So.2d 826.
This court in Diamond v. State, supra, ruled:
 "The comment in question was made during cross-examination and not during argument, consequently, it should not be construed as a remark on defendant's subsequent failure to testify."
Nonetheless, if the comment was improper, it was quickly cured by the alert actions of the trial court. As can be seen from the reading of the record, the district attorney was warned and the defense attorney was allowed to proceed with his cross-examination and to ask the question which he had attempted to ask previously. We note that, when the question was asked, it certainly stated facts that had not been presented and was stated in a manner indicating that it was factual.
Therefore, the court's admonition to the prosecutor and the court's ruling to allow the defense attorney to continue with his cross-examination were curative sufficient to cure any impropriety that may have existed in the comment.
We have searched the record and have found no error prejudicial to this appellant, therefore, the judgment of conviction by the Jefferson Circuit Court should be affirmed.
AFFIRMED.
All the Judges concur. *Page 1129