STATE OF CONNECTICUT *v.* GERALD H. FULLWOOD
(10486)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued January 6—decision released May 22, 1984

*Barry J. Ward,* with whom, on the brief, was *Gilbert Shasha,* for the appellant (defendant).

*C. Robert Satti,* state's attorney, with whom was *Michael L. Regan,* for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was convicted after a trial to a jury of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). On this appeal, he claims that the trial court erred in: (1) admitting evidence of the out-of-court identification of the defendant made by three witnesses in that they were derived from unnecessarily suggestive procedures and were unreliable; (2) permitting the in-court identification of the defendant by those three witnesses since they were made with the assistance of their improper out-of-court identifications; (3) excluding from evidence a response from one of the three identification witnesses regarding whether she had previously identified a photograph of a person other than the defendant as the perpetrator of the crime; and (4) failing to instruct

the jury concerning standards for assessing eyewitness identification testimony.[1]

The jury could reasonably have found the following facts: On June 8, 1978, at approximately 3 p.m., two black males entered Crandall's Package Store in New London. One of the two, the defendant, approached the counter behind which one of the package store employees, Shirley A. Santangelo, was standing. When Santangelo looked up, the defendant was standing about two steps away from her pointing a pistol at her. He told her that "this is a holdup" and he cocked the hammer on the pistol. The defendant then moved toward Elizabeth LaPlante, the proprietor of the store. He placed his arm around LaPlante and moved his hand up and down her side apparently frisking her. The defendant told LaPlante to go behind the counter and take the money out of her cash drawer. LaPlante did this, placing the money in a paper bag. At this time, the other black male, who was also armed, was near the front door. After LaPlante emptied the cash drawer, the defendant insisted that there was more money in the store, although he had been told otherwise, and he threatened to hit LaPlante if she did not give him more money. The defendant was then distracted by a noise and customers who had entered the store. The defendant then ordered LaPlante, Santangelo, and the customers into a room in the back of the store. He told them to put their wallets and the contents of their pockets into the bag containing the money from the cash drawer, and the victims did so. At about this time, Donald Barry, an off duty state trooper who was approaching the entrance to a bar located next to the package store, became aware that "something [was] going on at the package store . . . ." As Barry approached the front of the store, the defendant's

---

[1] The state filed a cross appeal which was dismissed by this court on October 4, 1983.

accomplice pulled a gun on him and ordered Barry into the store. After a period in the front portion of the store, he joined the other victims in the back room. The defendant then ordered everyone in the back room to lie on the floor and not to move for several minutes. The victims complied with this demand and the defendant and his accomplice left the store.

After the robbery had occurred, police officers arrived at the package store and a brief description of the events was taken by Officer Glenn Davis of the New London police department. Santangelo described one of the perpetrators, the defendant, to Davis as being a short, stocky black male, approximately five feet ten inches, and gave a description of his clothing. LaPlante "verified" this description. This description was included in Davis' written report of the robbery.[2] Barry described one of the perpetrators to the police as a black male, about twenty-five to thirty years old, with a stocky build, approximately five feet eight inches, close-cropped hair and a receding hairline.

Later that day, Santangelo went to the New London police station where she viewed approximately six hundred to seven hundred mug shots without making an identification. Approximately two weeks later, Santangelo viewed a series of approximately one hundred slides at the Norwich police station without making an identification. Barry also viewed in excess of one hundred slides at the Norwich police station without making an identification.

Some months thereafter, in December, 1978, Detective Walter Petchark of the New London police department assembled an array of seven photographs, one of which included a photograph of the defendant, and

---

[2] Officer Davis testified that he was anxious to get out a quick description of the perpetrators and that he did not make a further inquiry into other identifying characteristics of the perpetrators such as hair, eyes, ears, hands, voice, and whether either or both wore glasses.

he brought the array to the package store for LaPlante and Santangelo to examine. Petchark showed the array first to LaPlante, who made a "tentative"[3] identification of the defendant's profile photograph. Later that day, Petchark also showed the array of photographs to Santangelo and she identified the defendant's photograph as a photograph of one of the perpetrators. Barry also made an out-of-court photographic identification of the defendant in December, 1978. This resulted from a visit to the Groton police station where, after viewing some photographs of black males which were located on a table, he identified the defendant's photograph as a photograph of one of the perpetrators of the robbery in question.

Subsequent to their out-of-court photographic identifications of the defendant, LaPlante and Santangelo observed the defendant at grand jury proceedings held in March and August, 1979, and both identified the defendant, who was present at those proceedings, as one of the perpetrators. Barry also observed and identified the defendant at the August proceedings. All three identified the defendant at trial before the jury.

I

We first address the defendant's claim that the out-of-court identifications resulted from unnecessarily suggestive procedures and were unreliable.[4] Specifically with regard to LaPlante's out-of-court photographic

---

[3] LaPlante testified before the jury that "I made a tentative identification of one [photograph]. As I told [Petchark], I would never make a positive identification from any mug shot, because they just don't mean that much to me."

[4] We note at this point that the record reflects that no pretrial motions to suppress identification evidence were made by the defendant. The state maintains that the defendant did not object at trial to the testimony of LaPlante, Santangelo, and Barry regarding their identifications of the defendant and, therefore, he cannot now raise this issue on appeal. We will address these claims under State v. Evans, 165 Conn. 61, 327 A.2d 576 (1973).

identification, the defendant asserts that the photographs in the array presented to her by Petchark were unnecessarily suggestive and that because LaPlante had not viewed any mug shots regarding the robbery for nearly six months "it had to be unavoidably apparent to her that . . . Petchark [showed her the array] because he thought there was a likely suspect among the seven subject pictures." He also asserts that her identification of the defendant at his grand jury proceedings was "unquestionably suggestive." The defendant incorporates by reference these same claims regarding Santangelo's out-of-court identifications of the defendant and he further claims that Santangelo's photographic identification was unnecessarily suggestive because when she viewed the array of photographs assembled by Petchark, she was aware that LaPlante had already made a tentative identification of one of the photographs. Concerning the asserted suggestiveness of Barry's photographic identification, the defendant points to the circumstance that Barry knew that the person in the photograph had been recently arrested for another charge; that six to seven months had elapsed since Barry had been asked to identify any photographs; and that no explanation has been offered as to why a physical lineup was never conducted or why a photographic array was not assembled. The defendant also points to the "suggestiveness inherent" in Barry's identification of the defendant at the grand jury proceedings.

## A

Regarding the photographic identifications, we point out initially that our cases make it clear that a conviction which is based upon an in-court identification which follows an out-of-court photographic identification will be set aside " ' "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable mis-

identification." *Simmons* v. *United States,* 390 U.S.
377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).' *State*
v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979)."
*State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843
(1983); *State* v. *Vass,* 191 Conn. 604, 609, 469 A.2d 767
(1983); *State* v. *McKnight,* 191 Conn. 564, 570, 469 A.2d
397 (1983). A defendant who moves to suppress iden-
tification evidence bears the initial burden of proving
that the identification resulted from an unconstitutional
procedure. *State* v. *Vass,* supra, 608; *State* v. *McKnight,*
supra; *State* v. *Kinsey,* 173 Conn. 344, 345–46, 377 A.2d
1095 (1977). The required constitutional inquiry " 'is
made on an ad hoc basis and is two-pronged: first it
must be determined whether the identification proce-
dure was unnecessarily suggestive; and second, if it is
found to have been so, it must be determined whether
the identification was nevertheless reliable based on
examination of the "totality of the circumstances." ' "
*State* v. *Doolittle,* supra, quoting *State* v. *Theriault,* 182
Conn. 366, 371–72, 438 A.2d 432 (1980); *State* v. *Vass,*
supra, 608–609; *State* v. *McKnight,* supra, 569.

We find no merit to the defendant's claim of unneces-
sary suggestiveness regarding the photographic iden-
tifications by LaPlante and Santangelo. Preliminarily,
with regard to his claim that it must have been "una-
voidably apparent" to both LaPlante and Santangelo
that because they had not viewed mug shots in rela-
tion to this robbery for about six months, a likely sus-
pect was among those pictured in the array, we note:
"It has been generally recognized that the presenta-
tion of several photographs to witnesses, including that
of the suspect—the basic procedure used by the police
in this case—is by itself a nonsuggestive and constitu-
tionally acceptable practice, in the absence of any
unfairness or other impropriety in the conduct of the
exhibit." *State* v. *Hafner,* 168 Conn. 230, 237, 362 A.2d
295, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed.

2d 74 (1975), citing *Simmons* v. *United States,* supra, 382–84. Arguably, one can speculate, as the defendant does here, that any presentation of an array of photographs or, in the analogous circumstances, of a lineup, creates some suggestion that the police may consider one of those persons presented to the witness is a suspect in the case. This does not, however, give rise to a very substantial likelihood of irreparable misidentification. See, e.g., *Webber* v. *State,* 376 So. 2d 1118, 1126 (Ala. Cr. App. 1979), cert. denied, *Ex Parte Webber,* 376 So. 2d 1129 (Ala. 1979); *Fletcher* v. *State,* 337 So. 2d 58, 59 (Ala. Cr. App. 1976); *People* v. *Harrison,* 57 Ill. App. 3d 9, 13, 372 N.E.2d 915 (App. Ct. 1978). The circumstance that six months had passed since the witnesses were presented with photographs by the police concerning the robbery, in and of itself, does not render the array in this case one which could fairly be considered to be so unnecessarily suggestive that it gave rise to a substantial likelihood of misidentification. Rather, such a circumstance is only one factor which is properly taken into account by the court in evaluating the reliability of the identification made where there has been a showing of some unnecessary suggestiveness. See, e.g., *State* v. *Vass,* supra, 608–12; *State* v. *McKnight,* supra, 572; *Manson* v. *Brathwaite,* 432 U.S. 98, 115–16, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

We must also reject the defendant's claim regarding any knowledge that Santangelo may have had concerning a previous identification by LaPlante from the array. In the absence of the jury, LaPlante was asked whether she discussed with Santangelo whether she had made an identification from the array.[5] She responded: "I don't remember that. I think that I told

---

[5] The court entered an order sequestering the witnesses on the first day of trial.

her that I had made a tentative one, but that I am not very good at picking out mug shots. People are different." Santangelo testified, in the absence of the jury, that LaPlante had told her "[o]nly that Detective Petchark was going to bring [photographs] up to show them to me" and that to her recollection LaPlante made no suggestion of any kind that she should identify one of the photographs." The credibility of the witnesses on a challenge to identification evidence is a question for the trial court to determine. *State* v. *Vass,* supra, 610; *State* v. *McKnight,* supra, 571–72. To the extent that such a suggestion, if made, would render the array unnecessarily suggestive in the context of Santangelo's identification, the trial court reasonably could have concluded that Santangelo was not aware of LaPlante's previous identification.

We also find that the defendant's claim that the photographic array itself was unnecessarily suggestive to be without merit. Specifically, he points to the differences in the angles of the profile photographs, that certain of the photographs are clearer than others, the fact that the defendant's photograph shows what appears to be a fresh scar on his head, that in two of the photographs the height of the subjects pictured is apparent from measures which appear in the background which do not match the height of the defendant as contained in the police report, and that three of the subjects in the array had beards.

We note first that although the photographs in the array do not represent the subjects' profile views in exactly the same manner, we fail to see how this could possibly lead the witnesses to focus their attention on and identify the defendant's photograph to the exclusion of the others. The differences among the profile views of the majority of the seven photographs are of a slight degree. Similarly, the claimed variance in the clarity of some of the pictures arguably exists with

three being somewhat less clear than the other four, of which one is the defendant's. Such variations of the nature and degree presented in this array, in and of themselves, do not render the identification unnecessarily suggestive. *State* v. *McKnight,* supra, 571; *State* v. *Davis,* 175 Conn. 250, 254, 397 A.2d 1347 (1978). Importantly, there is no indication from their testimony that either LaPlante or Santangelo was affected by these circumstances. Further, we point out that although the defendant claims that three of the subjects in the array have beards, each of the seven subjects in fact has varying degrees of facial hair and, like the variations in the photographs noted above, it cannot fairly be said that this conveyed to the witnesses that the defendant was the person whom the police believed to be the perpetrator of the robbery. See, e.g., *United States* v. *Sanchez,* 422 F.2d 1198, 1200–1201 (2d Cir. 1970). Compare *State* v. *Maturo,* 188 Conn. 591, 594–96, 452 A.2d 642 (1982) (four man lineup consisting of individuals found near crime scenes not unnecessarily suggestive where suspects of different heights and the defendant was the only one with a mustache) with *State* v. *Gold,* 180 Conn. 619, 655, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980) (photographic array unnecessarily suggestive where defendant's picture was the only one with a mustache drawn on it).

Moreover, we also reject the defendant's claim that the array was impermissibly suggestive because his photograph was the only one in the array which showed the presence of a scar on his head. We point out that in this case there was no testimony from any of the identifying witnesses regarding a scar on the perpetrator's head. This array quite clearly is not at all like the array which we found unnecessarily suggestive in *State* v. *Gold,* supra, where the witness had described the perpetrator as having a mustache and the array presented

to that witness consisted of four photographs with only the defendant's photograph having a mustache drawn upon it. Rather, the appearance of the scar on the defendant's photograph in this case, in the absence of any reference to a scar in the prior descriptions given by the witnesses, could arguably be viewed as a suggestion that the defendant was not the suspected perpetrator. Thus, the fact that the defendant's photograph in this array was the only one which revealed a scar simply cannot fairly be considered to have been any signal to the witnesses that the defendant was the person whom the police believed to be the perpetrator of the robbery.

We also reject the defendant's claim of impermissible suggestiveness regarding the presence of height measures in the background of two of the seven photographs in the array.[6] We have in the past indicated that the presence of height calibrations next to the individuals pictured does not, in and of itself, render an array unnecessarily suggestive. See, e.g., *State* v. *Vass*, supra, 609–11. In *Vass*, although the witness had described the perpetrator as being between five feet seven and five feet nine inches tall, height calibrations were present on four of the six photographs in the array, three of which indicated that the subject was approximately six feet tall. The defendant's photograph contained an indication concerning his height only on the back of his photograph. In finding that array not to be unnecessarily suggestive, we pointed out the absence of an indication that the witness had based her identification on the height calibrations and that she had identified the photograph when she saw the face of the subject. Similarly, in the present case, there is no indication that

---

[6] The police report of the robbery described one of the perpetrators, the defendant, as five feet ten inches and the other as six feet two inches. The height measures in two of the photographs show that one subject is approximately six feet three inches and the other appears to be approximately five feet three inches.

Santangelo and LaPlante were in any way influenced by the presence of the height calibrations in two of the photographs. Moreover, even if they did advert to the height calibrations, which indicated a height that varied from the description of the defendant, they could have eliminated those two photographs from consideration and still had five others, of which one was the defendant's and which were devoid of any height indication. Thus, we cannot find in the circumstances of this case that the array itself was unnecessarily suggestive.

We are also not persuaded that Barry's out-of-court photographic identification of the defendant at the Groton police station was derived from any unnecessarily suggestive means. We first point out that the record before us reveals little detail regarding the circumstances surrounding Barry's photographic identification.[7] In the absence of the jury, Barry testified that he viewed a group of photographs on a desk, one of which he identified as the defendant's. He stated that these were placed on the table "as suspects were developed and photographs accumulated." He also stated that the defendant's photograph was in no way indicated as an "appropriate one" for him to view and he stated that "I am an investigator and I have been working with other investigators throughout the area, so I was well aware of what was going on." Barry further indicated that he was aware that a person, presumably the defendant, had been picked up in connection

---

[7] At the trial, in the presence of the jury, Barry testified regarding the events of the robbery and made an in-court identification of the defendant without objection by defense counsel. He also testified regarding his identification of the defendant at the grand jury proceedings. Subsequently, he was questioned regarding his out-of-court identification of the defendant. At this time, he testified that he saw a photograph of one of the perpetrators of the robbery. He was then shown a photograph of the defendant by the prosecutor, and he identified that photograph as the one which he viewed at the Groton police station.

with another crime. He also testified that although there was a date at the bottom of the photograph which indicated the date of arrest, he did not "pay attention to that" and he "just paid attention to the person pictured."

As indicated earlier, the defendant, in attempting to suppress identification evidence, has the initial burden of showing that the identification resulted from an unconstitutional procedure. *State* v. *Vass,* supra, 608; *State* v. *McKnight,* supra, 570. All that has been shown here is that Barry identified the defendant's photograph which was located on a table with the photographs of others who apparently had been arrested for another robbery. The defendant has not made an initial showing of a police procedure which suggested to Barry that he should identify the defendant's photograph. These circumstances, as claimed by the defendant, certainly are not analogous to those presented in *Manson* v. *Brathwaite,* supra, 101, 109, where a police officer placed a single photograph of a suspect on the desk of another officer for him to examine which resulted in an identification. Moreover, although the defendant claims that there is no explanation as to why a lineup or photo array was not assembled, we reiterate that "[a]bsent constitutional barriers, so long as the witness has identified the defendant with reasonable probability, whether the identification is the result of a photo display, a line-up, a show-up or otherwise, the evidence is admissible." *State* v. *Ledbetter,* 185 Conn. 607, 612, 441 A.2d 595 (1981); see *State* v. *Vass,* supra, 611. Thus, on the record before us we cannot find that the defendant met his threshold burden of proving that Barry's identification resulted from some unconstitutional procedure.[8] Id.

---

[8] Even if we could conclude that the defendant has met this threshold burden, he could not have this identification evidence suppressed if the identification was nonetheless reliable. "[R]eliability is the linchpin in deter-

We next turn to the defendant's claim that the identifications made by LaPlante, Santangelo, and Barry at the grand jury proceedings were also derived from unnecessarily suggestive means and were unreliable. In claiming that the observation of an accused at a grand jury hearing is "unquestionably suggestive" the defendant has made little more than a bare assertion. The state concedes that the defendant's presence before the grand jury was a "suggestive factor."

Accepting the state's concession that the defendant's presence before the grand jury was a "suggestive factor," we go on to examine whether the identifications made during the grand jury proceedings were nonetheless reliable.[9] As noted above, "reliability is the linch-

mining the admissibility of identification evidence." *State* v. *Doolittle,* 189 Conn. 183, 192, 455 A.2d 843 (1983). The constitutional inquiry concerning reliability requires the trial court to consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the [identification], and the length of time between the crime and the [identification]." *Neil* v. *Biggers,* 409 U.S. 188, 199–200, 93 S. Ct. 374, 34 L. Ed. 2d 401 (1972). See also *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *McKnight,* 191 Conn. 564, 572, 469 A.2d 397 (1983).

In this case, Barry testified that he had viewed the defendant during the robbery for three to four minutes, in good lighting. He had described the defendant immediately after the robbery to the police as a black male with a stocky build, probably twenty-five to thirty years old, with "close-cropped hair" and "sort of a receding hairline." In addition, he had viewed numerous photographs and slides prior to his identification of the defendant without identifying any of them and there is no indication that he had viewed a photograph of the defendant prior to his positive identification at issue. The fact that this identification occurred approximately six months after the incident does not "under all the circumstances" of this case create a " 'very substantial likelihood of irreparable misidentification.' " *Manson* v. *Brathwaite,* supra, 116, quoting *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). See, e.g., *State* v. *Knox,* 529 S.W.2d 455, 462 (Mo. App. 1975); see also *State* v. *Green,* 647 S.W.2d 902, 905 (Mo. App. 1983).

[9] We note with regard to this pretrial confrontation, it has been stated

pin in determining the admissibility of identification evidence"; *State* v. *Doolittle,* supra, 192; and the circumstances of this case, when examined in view of the factors to be considered in evaluating such evidence set forth previously,[10] clearly demonstrate the reliability of the grand jury identifications. At the time of the robbery, Santangelo had observed the defendant for a total of about twelve to fifteen minutes and during most of that time her view of him was unobstructed. For approximately five to eight minutes the defendant was "[l]ess than an arm's length away." She noticed that the weapon he was using appeared to be a .38 calibre revolver, with "possibly a two-inch barrel on it."[11] The store was lit with fluorescent lights. Although she could not recall exactly how she had described the defendant to the police on the day of the robbery except that he was a black male with a stocky build, she stated that she had talked with several officers on that day and she believed that she mentioned that "he was in his early to middle 30's."[12] She viewed approximately six hundred to seven hundred mug shots at the New London police department on the day of the robbery and approximately one hundred slides at the Norwich police department about two weeks later without making an identification. In the absence of the jury, there

---

that "it is always necessary to 'scrutinize *any* pre-trial confrontation.' " *Kirby* v. *Illinois,* 406 U.S. 682, 690, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), quoting *United States* v. *Wade,* 388 U.S. 218, 227, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). Even an accidental pretrial confrontation, if found to be impermissibly suggestive, must be shown to be nonetheless reliable under the constitutional principles which guide us in determining the admissibility of identification evidence. See, e.g., *Green* v. *Loggins,* 614 F.2d 219, 222–23 (9th Cir. 1980).

[10] See footnote 8, supra.

[11] Santangelo testified regarding her familiarity with guns and she stated that she was carrying a .38 calibre pistol, for which she had a permit, under her blouse on the day of the robbery.

[12] During the defendant's attempt to suppress the identification evidence, in the absence of the jury, there was testimony from two police officers that the defendant's date of birth was July 18, 1945.

was testimony that there was not a photograph or slide of the defendant in either the New London or Norwich police files when Santangelo viewed the photographs and slides at those police departments. Santangelo stated that she identified the defendant at the grand jury proceedings because she recognized him as one of the perpetrators and not because he was present before the grand jury.

LaPlante estimated that she had observed the defendant under the same lighting conditions as Santangelo for approximately five to seven minutes noting that she "really observed him the whole time, because he was right next to me." Her description of the defendant on the day of the robbery was consistent with that given by Santangelo. She had viewed photographs which had been brought into the package store shortly after the robbery without making an identification. There is no question that she positively identified the defendant before the grand jury.

Barry observed the defendant for three to four minutes and he described the lighting in the package store as "good." He viewed in excess of one hundred slides at Norwich shortly after the robbery without making an identification. Regarding his identification at the grand jury proceedings, he stated: "I had been sitting in the audience watching the proceedings . . . when I observed [the defendant] and I made a note that he was the person who was involved in the robbery. . . ." He recognized the defendant "[b]ecause of his hair style and just his facial characteristics. . . ."

The only factor in our test of reliability which arguably militates against a finding of reliability of the identifications in this case is the time between the initial confrontation and the grand jury identifications.[13] See

_____

[13] The grand jury proceedings in this case occurred on two dates: March 12, 1979, and August 21, 1979. Santangelo and LaPlante appeared and iden-

*State* v. *Hamele,* 188 Conn. 372, 378, 449 A.2d 1020 (1982); see also footnote 8, supra. In view of what has been set forth above, however, we conclude that the trial court could have reasonably found under our test for reliability that there was not " 'a very substantial likelihood of irreparable misidentification.' " *Manson* v. *Brathwaite,* supra, 116, quoting *Simmons* v. *United States,* supra, 384. It must be remembered that short of that point we rely on the good sense and judgment of American juries to weigh evidence with some element of untrustworthiness since such evidence "is customary grist for the jury mill." *Manson* v. *Brathwaite,* supra.

## II

We now address the defendant's claim that the trial court erred in excluding LaPlante's response to a question as to whether she had previously identified a photograph of a person other than the defendant as the perpetrator of the crime. The events relevant to this issue can be summarized as follows: At trial, in the absence of the jury, LaPlante testified that she had been shown some photographs by a police officer within a few days of the robbery. When shown an array of photographs by defense counsel, LaPlante pointed to one and stated: "This is Fullwood right here. That's Fullwood right there. That's Fullwood." She then stated, immediately thereafter, that the photograph "looks most like him. . . . [T]hat looks just as he did on [the day of the robbery]."[14] That photograph was then received and marked for identification only.

---

tified the defendant at both proceedings. Barry attended the August 21, 1979 proceedings and he identified the defendant at that time.

[14] During the voir dire examination by defense counsel, the following occurred:

"Q. Was Gerald Fullwood's picture—This is Gerald Fullwood. This person seated at Counsel table; the black man. Was Gerald Fullwood, was his picture among those shown to you by Lieutenant Bucko within a few days of the crime?

Subsequently, in the presence of the jury, defense counsel on cross-examination of LaPlante showed her the array of photographs which he had previously shown her out of the jury's presence and asked her if she had ever seen them before. LaPlante said that she had, and defense counsel asked her if the perpetrator's photograph was in this array. The court sustained the state's objection that the question was "asked about an item not in evidence." Shortly thereafter, defense

"A. I don't think so.

"Q. On that occasion . . . did you pick out any of those photos as appearing to have the features of the person who committed the crime?

"A. I don't recall. I don't think so. I think it was when Lieutenant Petchark brought me the pictures.

"Q. On that first occasion then, did you tell [the police officer] that you could not pick out any of those persons as having the features of the perpetrators of the crime?

"A. I don't recall what I told him.

"Q. Might you have identified someone from that set of photos?

"A. I might have. I might have said that one was very similar.

"Q. What did the photographs that were shown to you look like? That is to say, can you describe the set of photographs to us?

"A. No.

"Q. Let me show you some photographs and ask you if you recognize this set of photographs?

"A. No. [The police] brought me much bigger pictures than that, I'm sure.

"Q. Well, let me call your attention, Mrs. LaPlante—

"A. I think I have seen these pictures, though.

"Q. Let me call your attention to the fact that the photos which I am showing you, have been stapled together in such a way so that the whole photo doesn't show. Only approximately half or a little more than half of each photo shows.

"A. *This is Fullwood right here. That's Fullwood right there. That's Fullwood.* (Witness indicating.)

"Q. You see the perpetrator?

"A. As he looked that day.

"Q. Which photo is that?

"A. This one. (Witness indicating.)

"Q. It's your testimony that the third photo from the top is Fullwood?

"A. Looks most like him.

"Q. Well, that's not my question exactly. My question is that, —

"A. To me, that looks just as he did that day.

"Q. That looks just as the perpetrator of the crime looked on that day?

"A. Yes, sir." (Emphasis added.)

counsel asked: "Have you ever identified any of these photographs as being the photograph of the perpetrator of the crime?" The state objected, claiming that a proper foundation had not been made. At this point, the jury was excused and colloquy took place among the court, defense counsel, and the state regarding defense counsel's line of questioning. The court then permitted defense counsel "the opportunity . . . to question the witness with respect to this" while the jury was still out. At this time, the court raised the question concerning what LaPlante had said previously concerning the photo.[15] Defense counsel, however, was then permitted further inquiry of LaPlante concerning this matter in the absence of the jury. LaPlante then testified that she had seen the array during a previous examination by defense counsel and that on that occasion she identified a photograph in the array as appearing to be "similar" to the defendant. Defense counsel then made a claim, based on this testimony, that she recognized the person in the photograph as having similar features and that he be permitted to inquire of this in front of the jury. The state indicated at this point that it considered this offer to be "substantially different" from defense counsel's previous offer and that it would not now make an objection.

The defendant claims that the effect of these events at trial prevented the defendant from placing before the jury "what really happened" during LaPlante's previous testimony, i.e., her "emphatic exclamations" of "[t]his is Fullwood right here, that's Fullwood right there, that's Fullwood," when being shown a photograph of someone other than the defendant. He claims that the "substantially different basis" upon which

---

[15] Defense counsel stated that LaPlante's previous testimony in the absence of the jury contained an identification of one of the photos. The court indicated that it thought that LaPlante had stated that one of the photographs "looked like [the defendant], or looked like he looked that day."

defense counsel was allowed to proceed regarding LaPlante's previous testimony resulted in his being able to introduce certain "general and evasive testimony regarding the subject . . . [which] did not at all mitigate the Court's error in excluding other plainly unobjectionable direct questions posed." The state, however, in pointing to various parts of the transcript, claims that the matter of LaPlante's previous testimony had been fully explored in the presence of the jury. We agree with the state.

Subsequent to the events set out above, defense counsel, on cross-examination and before the jury, referred LaPlante to the photographs previously shown to her by him. Based upon a thorough examination of the record, it is quite clear that regardless of the apparent disagreement over the nature and scope of defense counsel's questioning of LaPlante on this matter, he nonetheless was permitted, in the presence of the jury, to explore fully what LaPlante had previously testified to in the absence of the jury concerning her "identification" of a person other than the defendant as the perpetrator of the robbery.[16]

---

[16] The following took place before the jury upon examination by defense counsel:

"Q. Mrs. LaPlante, did you identify one of these three photographs as appearing to be the perpetrator of the crime committed?

"A. No, as appeared to me like Gerald Fullwood.

"Q. As appearing to be like Gerald Fullwood, not as appearing to be like the perpetrator of the crime?

"A. No."

\* \* \*

"Q. All right. Did you yesterday say that one of these photographs was Gerald Fullwood?

"A. Well, I did say that this one was like Gerald Fullwood as he was that day.

"Q. *Didn't you say it was Gerald Fullwood?*

"A. *I said so, but I didn't mean it in that sense.*

"Q. *Did you say that the third photograph from the top was Gerald Fullwood?*

"A. *Yes.*

## III

Finally, we turn to the defendant's claim that the trial court erred in failing to instruct the jury concerning standards for assessing eyewitness identification testimony. In this regard, the defendant claims that "fundamental fairness" requires that the jury be informed of certain basic principles which are relevant to assessing identification testimony[17] and that since the trial

---

"Q. As the perpetrator of the crime appeared on the day of the crime, is that correct?

"A. Yes. I meant that he had the same round face and the same— . . . ." (Emphasis added.)

Subsequent to this exchange, on recross-examination by defense counsel, the following occurred before the jury:

"Q. Yesterday, Mrs. LaPlante, when you identified, or when you picked out or called attention to the photo [of someone other than the defendant], didn't you say when you saw that photo, not merely that that looks like him; it has some of the same features, but *didn't you actually say, 'That's him. That's Gerald Fullwood.'*

"A. *I may have. I did say it.*

"Q. You did say that, didn't you?

"A. But I didn't, —

"MR. SATTI: Well, I think she should be allowed to finish.

"THE COURT: *She did say it.* She's answered.

"MR. SHASHA: She's answered the question.

"BY MR. SHASHA: (Continuing)

"Q. So that you didn't, at that point, —

"A. I did not.

"Q. *You did say more than that it looks like him?*

"A. My seeing glasses are for close things. So, you know, that would not be a positive identification under any circumstances.

"Q. *Excuse me, Mrs. LaPlante, but didn't you say —*

"A. *I said it, yes.*

"Q. *You did say, 'That's him. That's Gerald Fullwood.'*

"A. Yes.

"Q. *And as you did so, you pointed to the photo which is Number Three on Defendant's Exhibit 1?*

"A. *Yes.*" (Emphasis added.)

[17] Specifically, the defendant claims that fundamental fairness required that the jury should have been informed: (1) that suggestion in an identification procedure may be considered as negatively impacting on the probative value of an identification; and (2) of the factors concerning the reli-

court did not charge in accordance with those principles, he was denied a fair trial. The state points out, however, that counsel for the defendant not only failed to request any charge concerning identification testimony but also failed to except to the charge given. It maintains that the merits of the defendant's claim regarding the trial court's instructions should not be addressed on this appeal since this is not a case which falls within the *"Evans* bypass rule."

Our general rule is that "[t]he appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or an exception has been taken immediately after the charge is delivered by the party appealing." Practice Book §§ 854, 3063; see also Practice Book § 3060F (c) (1) and (2). " 'The purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials.' *State* v. *Packard,* [184 Conn. 258, 281, 439 A.2d 983] (1981) . . . ." *State* v. *Miller,* 186 Conn. 654, 658, 443 A.2d 906 (1982).

Because we need not consider claims not distinctly raised at trial, since such claims are considered waived; *State* v. *Miller,* supra; *State* v. *Evans,* 165 Conn. 61, 65–66, 327 A.2d 576 (1973); we will consider such claims on appeal "[o]nly in the most exceptional circumstances." *State* v. *Evans,* supra, 69; *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982); see *State* v. *Packard,* supra, 281. The defendant's claim essentially is that he has a fundamental constitutional right to a jury

ability of the identification which are found in *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and its progeny. See, e.g., footnote 8, supra.

instruction which includes basic principles relevant to assessing identification testimony.[18]

In *State* v. *Packard,* supra, we declined to address a defendant's claim, which was raised for the first time on appeal, that the trial court erred in failing to charge the jury on the dangers of eyewitness misidentification. Id., 281–82. The defendant's claim in this case that the trial court should have instructed, sua sponte, on "standards for assessing eyewitness testimony" and not necessarily that it should have instructed on the "dangers of eyewitness misidentification," is a distinction without a difference, and it does not justify the invocation of the *Evans* rule in this case. Indeed, it is quite apparent that the purpose behind both types of instructions is the same; that being, to guide jurors in assigning weight to and assessing the credibility of identification evidence by alerting jurors to the vagaries of identification evidence and by focusing on the shortcomings of such proof and the prosecution's obligation to prove a defendant's identity beyond a reasonable doubt. See *United States* v. *Kavanagh,* 572 F.2d 9, 11 (1st Cir. 1978); *United States* v. *Barber,* 442 F.2d, 517, 525–28 (3d Cir.), cert. denied, 404 U.S. 958, 92 S. Ct. 327, 30 L. Ed. 2d 275 (1971).

We point out that during the trial, defense counsel had carefully and heavily focused on the issue of misidentification when cross-examining the state's witnesses, and the trial court's closing charge to the jury fully covered the matter of the credibility of the witnesses and the state's burden of proof. See, e.g., *United States* v. *Roundtree,* 527 F.2d 16, 19 (8th Cir. 1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1133, 47 L. Ed. 2d 332 (1976); see also, *United States* v. *Kavanagh,* supra, 11–13. In the absence of an appropriate request to charge or a proper exception to the charge as given,

[18] See footnote 17, supra.

we do not consider the defendant's claim that the trial court erred in not instructing the jury, sua sponte, on standards for assessing eyewitness identification. *State v. Packard,* supra, 281–82.

There is no error.

In this opinion the other judges concurred.