[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a proceeding for termination of parental rights filed by the Commissioner of the Department of Children and Youth Services, (hereinafter DCYS) pursuant to 17-43a(a) of the Connecticut General Statutes. DCYS requests the termination of parental rights of Veronica S., the mother of Anthony M., Jennifer S. and Jacqueline on the grounds of abandonment, failure to achieve personal rehabilitation, denial by acts of parental commission or omission, the care, guidance or control necessary for the physical, educational, moral or emotional well-being of the children, and lack of an ongoing parent-child relationship. See 17-43a(b)(1), (2), (3), and (4) of the Connecticut General Statutes. Anthony S. was born on May 11, 1982; the twins, Jacqueline S. and Jennifer S. were born on October 24, 1984.
The petition seeks the termination of the mother's parental rights only, as the mother had not disclosed the name of the father until the end of the trial approached. An individual had acknowledged paternity of the boy, but not of the girls. On August 8, 1988, the mother telephoned the Department of Children and Youth Services (DCYS) to request the placement of her children because she had been expelled from the Kiwanis shelter. The mother signed voluntary permissions to place her children and all three children were placed in foster care where they have remained since August 8, 1988. On August 16, 1988, the mother signed a two month social service agreement with DCYS during which time Ms. Smith was to find employment and obtain suitable housing so that DCYS would not file neglect petitions.
The mother failed to comply with the social service agreement and she did not maintain regular contact with DCYS or with her children.
On January 30, 1989, neglect petitions were filed as to all three children as there was no real indications from August 8, CT Page 2617 1988, to the filing of the petitions, that the mother was able or willing to care for her children.
On March 2, 1989, the children were adjudicated neglected and uncared for and committed to DCYS. It was agreed that visitation would take place every other week, and that the mother could have unlimited telephone contact with her children.
DCYS filed the petitions for termination of parental rights and petitions for extension of commitment on June 26, 1990. The case was first heard on July 20, 1990, when the petitions for extension of commitment were granted, by agreement, and the TPR petitions were continued for three months, to give the mother yet another opportunity to have the children returned to her. Since the mother failed to take advantage of the opportunity, the trial began on October 26, 1990.
The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17-43a(b) of the Connecticut General Statutes; In re Juvenile Appeal (84-AB), 194 Conn. 254,269; In re Theresa S., 196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83-BC), 189 Conn. 66, 72; In re Juvenile Appeal (84-6),2 Conn. App. 705, 708, cert denied, 195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 754, 747-48. Clear and convincing evidence has been described as a level of persuasion that lies between the usual civil requirement of proof by a fair preponderance of the evidence and the criminal standard of proof beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229,234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondent's rights as a parent should be put to an end. In re Juvenile Appeal (84-3), 1 Conn. App. 463,468. The plaintiff is required to prove only one of the prevail on the petition. In re Juvenile Appeal, 1 Conn. App. 463, cert denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Conn. Practice Bk. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings rather, a unified hearing is permissible. In re Juvenile Appeal, 193 Conn. 254,259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition, in this case, June 26, 1990. The dispositional phase takes into account the best interests of the children and the court is permitted to take CT Page 2618 into consideration events which had occurred after the filing of the petition to determine the best interests of the children.
DCYS alleges that the children have "been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to welfare . . ." of the children. Section 17-43a(b)(1) of the Connecticut General Statutes. Abandonment focuses on the parent's conduct and it is a question of fact for the trial court. In re Rayna M., 13 Conn. App. 23; In re Juvenile Appeal,183 Conn. 11, 14. "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child," as referred to in the statute. In re Shavoughn K., 13 Conn. App. 91, 97, cert. denied 207 Conn. 805; In re Migdalia M., 6 Conn. App. 194, 208-09. "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern, for the child's welfare, statutory abandonment has occurred." In re Shavoughn K., supra, 97; In re Migdalia M., supra, 209; In re Juvenile Appeal, 183 Conn. 11.
"The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligation toward his or her children go further than a minimal interest . . . . The commonly understood general obligations of parenthood entails these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child, (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance . . . ." In re Rayna M., supra.
DCYS presented clear and convincing evidence that the mother abandoned all three children. There was a period of about six months when the mother did not see the children until the end of July, 1989.
For the rest of 1989, she visited with her children on August 8, 1989, October 11, 1989, and November 2, 1989 and missed scheduled visits on September 14, 1989, and September 25, 1989. Ms. Smith visited with her children for a total of five hours in 1989. She offered no explanation for her failure to visit her children, even during the Christmas season.
Ms. Smith was employed at UPS from August, 1989 until March, 1990, earning $9.00 per hour. On September 25, 1989 she missed a visit with her children, claiming that she did not have $3.00 for train fare. She did not ask the social worker for CT Page 2619 assistance with her transportation, nor did she ask any of her friends for assistance with transportation.
On September 29, 1989, Ms. Smith admitted to Loretta Jay of DCYS that she had been drinking heavily and admitted to missing three days of work in three weeks, due to her alcohol problem. Ms. Jay referred Ms. Smith to AA, counseling services and NHARP; and Ms. Smith agreed to attend AA and counseling. Ms. Smith did not follow through with these referrals.
Ms. Smith was hospitalized at Norwalk Hospital on January 12, 1990, with a diagnosis of alcohol and cocaine abuse. She was admitted for detoxification from alcohol.
During January, February and most of March, 1990, Ms. Smith did not contact DCYS. She did not call to ask about her children, or to schedule visits, although she did have direct telephone contact with her children. She was still employed at UPS, however, DCYS had no home address or telephone for her.
On March 23, 1990, Ms. Smith was again admitted to Norwalk Hospital. She had been involved in an altercation and was requesting detoxification from alcohol and cocaine. Ms. Smith admitted alcohol, marijuana and cocaine abuse. Ms. Smith entered Hall-Brooke Hospital, in Westport on March 26, 1990, for a three-week in-patient drug program. She was diagnosed as a poly-substance abuser, using alcohol, cocaine and marijuana. Upon discharge on April 16, 1990, she was referred to NHARP, and it was recommended that she attend AA or NA or CA meetings daily, and attend NHARP for individual therapy. Ms. Smith was discharged with a diagnosis of alcohol dependence, cocaine dependence and marijuana abuse. Her prognosis was guarded, especially if she did not participate in follow-up treatment. Ms. Smith contacted Loretta Jay while she was at Hall-Brooke where Ms. Jay arranged a visit on April 5, 1990 between Ms. Smith and her children. This was the first visit Ms. Smith had with her children since November 2, 1989, an interval of five months. Ms. Smith offered no reason or excuse for not having visited with her children for the five-month period. On April 11, 1990, Ms. Jay met with Ms. Smith at Hall-Brooke where Ms. Smith signed a social service agreement. The purpose of the agreement was to allow the resumption of telephone contact between Ms. Smith and her children, which had been suspended because they were upsetting to the children and Ms. Smith was abusing the privilege. On April 27, 1990, the court modified the previous telephone contact order to reflect these changes
Ms. Smith had a visit with her children on April 25, 1990, at the DCYS office in Bridgeport. Ms. Smith signed another service agreement with Ms. Jay on May 21, 1990. She was required CT Page 2620 to attend NHARP (Norwalk Hospital Addiction Rehabilitation Program), on a weekly basis. Ms. Smith attended NHARP for an intake assessment on April 23, 1990. She was scheduled to begin weekly group therapy on April 26, 1990, but she did not attend on April 26, 1990. She began her attendance at NHARP on June 14, 1990. She missed the June 21, 1990 meeting and attended the June 28, 1990 meeting. She missed meetings on July 5, 1990 and July 12, 1990. She then attended meetings on July 19, 1990, July 26, 1990 and August 2, 1990. This was the last session she attended.
She missed meetings on August 9, 1990, August 16, 1990, August 23, 1990 and August 30, 1990, and was discharged for lack of compliance with treatment. The NHARP Program requires a one-year commitment to support and maintain sobriety. The NHARP Program was recommended to Ms. Smith by Hall-Brooke Hospital and was also a requirement of DCYS.
When Ms. Smith was discharged from Hall-Brooke Hospital, she did not return to her job at UPS. She worked in June, 1990, cleaning houses for Mr. Amos Brown's wife. Since then, Ms. Smith did some part-time work for Holiday Inn in October, 1990. She has not been employed full time since March, 1990. Ms. Smith testified that she was a licensed hairdresser, but that her license had expired in 1981. She has not renewed it, nor applied to have it renewed since 1981, although she is currently not employed.
Ms. Smith testified that she has been on the Norwalk Public Housing waiting list since December, 1981. The records from Norwalk Housing Authority reflect an application dated December, 1984. Ms. Smith admitted that the December, 1984 application is the one the Housing Authority has on file. Ms. Smith told Ms. Jay in May, 1990, that she had refused an apartment at Roodner Court, a public housing project. Since Ms. Smith's children were removed from her care in August, 1988, Ms. Smith has been unable to find a suitable apartment for herself and her children. She is currently residing in an apartment, which is inadequately for her children.
During the 1990 year, Ms. Smith visited with her children on the following dates: April 5, April 25, June 7, July 5, August 1, August 22, September 12, September 27, October 11, and November 28, of 1990, for a sum total of ten hours of visits. In July, 1990, Ms. Smith agreed to another social service agreement. The agreement required Ms. Smith to advise DCYS of her current address; contact DCYS once a week to schedule visits with her children; she was required to remain sober and free of controlled substances and to comply with all of the conditions of probation.
Ms. Barber, the probation officer, testified that Ms. Smith CT Page 2621 did not comply with the conditions of her probation. She testified that Ms. Smith missed appointments and did not keep probation informed of her whereabouts. Ms. Smith failed to comply with that part of the service agreement.
Ms. Smith failed to provide DCYS with proof of her sobriety. She did not offer any independent evidence or testimony from any drug or alcohol program to verify her sobriety. After the agreement was signed on July 25, 1990, Ms. Smith failed to attend the NHARP Program, and was discharged for lack of compliance in August, 1990. At the visit on September 27, 1990, Ms. Smith refused any assistance from the worker to help her find a place to live. On October 11, 1990, Ms. Smith admitted to the social worker that she still had no place to live. At the trial, Ms. Smith admitted that she was living in a small apartment which inadequate for herself and her three children.
Ms. Smith agreed to contact DCYS weekly to schedule visits with her children. Ms. Smith visited with her children on August 1, 1990, and then not again for three weeks, until August 22, 1990. She then saw her children on September 12, 1990, September 27, 1990 and October 11, 1990. Ms Smith did not call or acknowledge Jennifer and Jacqueline's birthday on October 22, 1990. As of November 2, 1990, Ms Smith had not visited with her children since October 11, 1990, nor had she acknowledged the twins' birthday! Ms. Smith on November 2, 1990 requested a visit which was scheduled for November 8, 1990, but Ms. Smith missed this scheduled visit with her children. Ms. Smith visited with her children on November 28, 1990. This was her first visit with them since October 11, 1990. Ms. Smith failed to contact DCYS on a weekly basis to schedule visits with her children, and even during the course of the trial, from October 26, 1990 to December 14, 1990, Ms. Smith visited with her children only once, and missed a scheduled visit with them. Ms. Smith failed to comply with this requirement of the service agreement.
Anthony, Jennifer and Jacqueline are in a foster home, where the foster family wishes to adopt them, and the children have expressed their desire to remain with the foster family on a permanent basis. The children have expressed disappointment in their mother, and the last few visits have been unruly, and chaotic. The children were becoming increasingly upset by telephone contact with their mother, and in March, 1990, unrestricted telephone contact was suspended.
The children have been in foster care continuously since August, 1988, for a total of two years and four months. During that time, Ms. Smith has not found suitable housing; she has not maintained steady employment; she has not successfully completed CT Page 2622 a long-term drug and alcohol rehabilitation program; she has not remained sober; she has not maintained regular contact with DCYS; she has not maintained regular contact and visitation with her children; she was arrested for assault and has not complied with her conditions of probation; she has not cooperated with agency efforts to assist her and she has failed to comply with the provisions of all the social service agreements signed by her during the course of these two years and four months.
The court concludes that by the clear and convincing evidence it is in the best interests of Anthony, Jennifer and Jacqueline that the parental rights of their mother, Veronica Smith, be terminated, so that they may be adopted by their current foster family, and be given the opportunity to grow up in a normal, healthy and stable home.
The statutes do not contemplate a sporadic showing of "interest, concern or responsibility for the welfare of a child"; rather a parent must maintain a continuing reasonable degree of interest in the welfare of his or her child. In re Rayna M., supra, p. 38. "In characterizing statutory abandonment, the Supreme Court has emphasized that the focus is on the parent's conduct and that the question is one of fact to be resolved by the trial court in the light of relevant circumstances." In re Shannon S., supra, p. 151.
In this case, the court finds abandonment by clear and convincing evidence. From August, 1988, when the children were placed in care to the time of the filing of the petitions in June, 1990, Ms. Smith visited with her children for a total of five (5) hours in 1989 and a total of three (3) hours in 1990. After the petitions were filed, Ms. Smith saw her children for a total of seven (7) hours to the end of the trial on December 14, 1990. She allowed months to go by without visiting her children, or contacting DCYS. She failed to acknowledge holidays and birthdays. She failed to maintain regular contact with DCYS to inquire about her children and their welfare, or to schedule visits. Even during the course of the trial, she missed a scheduled visit.
For the period that the children have been in care, MS. Smith has failed to supply any necessaries for them; and she has failed to provide an adequate domicile for them.
All of these facts considered together has established by clear and convincing evidence that the respondent has abandoned the children and that the basis for abandonment has existed at the date of the petition. Where several grounds are alleged for the termination of parental rights, it is only necessary that one of the statutory grounds be established. In re Juvenile CT Page 2623 Appeal (84-BC), 194 Conn. 252, 258; In re Saba P., 13 Conn. App. 605,609. While each case turns on its own facts, the failure of the mother to display any love, affection or concern for the children on a consistent and reliable basis, and failing to provide any type of home life for them, are strong evidence of abandonment.
The second ground asserted for termination of parental rights is that the children have been found in a prior proceeding to have been neglected or uncared for, and that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in the life of the children. Conn. Gen. Stat. 17-43a(b)(2).
Anthony, Jennifer and Jacqueline came into care on August 8, 1988 and were adjudicated and committed to DCYS on March 2, 1989. They have been in care continuously since August 8, 1988, a total of (2) years and four (4) months.
The phrase "`personal rehabilitation' refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Rayna M., 1 Conn. App. 23, 32
(1987); In re Migdalia M., 6 Conn. App. 194, 203, cert. denied.,199 Conn. 809 (1986); In re Shannon S., 41 Conn. Sup. 145, 153, per curiam aff'd., 19 Conn. App. 20 (1989).
The Supreme Court has held that the six factors listed in Conn. Gen. Stat. 17-43a(d) need not be considered as part of the adjudication of the failure to rehabilitate ground. In re Barbara J., 215 Conn. 31, 47 (1990).
"As presently written, the statutory ground for termination provided by a parent's failure to rehabilitate with its emphasis on `a reasonable time' and `the age and needs of the child' came into existence as a result of amendments to 17-43a(b)(2) effective October 1, 1983. . . . The general effect of the legislative changes is a shortening of the time period in which a parent's rehabilitation may be achieved. What is a reasonable time is invariably a question of fact to be governed by attendant circumstances." In re Shannon S., ibid.
The age and needs of the child must be considered in determining the failure to rehabilitate. Anthony is nearly nine years old and Jennifer and Jacqueline are nearly six and one-half years old. The twins have now spent one-third of their lives in care, and all three children have been in care for more than two and one-half (2 1/2) years. When they were first placed, they came into care because Ms. Smith was homeless and unemployed, and CT Page 2624 could not afford to care for them. After nearly two and one-half (2 1/2) years, Ms. Smith is still unemployed and does not yet have appropriate housing for her family and her situation has not improved to allow her to provide for her children.
For nearly two and one-half (2 1/2) years, Ms. Smith has failed to visit her children on a regular basis; failed to maintain regular contact with them; failed to comply with the provisions of all the social service agreements; failed to maintain regular contact with DCYS; failed to complete a drug program; failed to maintain sobriety and failed to demonstrate an ability to be a responsible parent for her children.
Ms. Smith failed to abide by the terms of post-commitment service agreements, and failed to abide by any terms of the service agreement signed on July 25, 1990, after the TPR petitions had been filed. Failure to abide by such agreements or orders under the circumstances, provides cogent evidence of the mother's unwillingness or inability to change. In re Shannon S., supra, p. 15.
Ms. Smith failed to provide the court with any evidence of continued drug treatment, legal employment, stable housing, or any evidence that she is now in a position to be a full-time, responsible parent for her children.
Accordingly, the court finds by clear and convincing evidence that Veronica Smith has failed to rehabilitate herself, and that it is now unreasonable to allow further time for her to rehabilitate herself.
The Petitioner also alleges that Anthony, Jennifer and Jacqueline have been denied by reason of act or acts of commission or omission by the mother, the care, guidance or control necessary for their physical, educational, moral or emotional well-being. Conn. Gen. Stat. 17-43a(b)(3).
These children came into care as their mother could not provide a home for them. She was homeless and unemployed.
Ms. Smith still does not have a home for her children, and she remains unemployed. Ms. Smith was unable to provide her children with care in 1988, and she continues to be unable to provide them with care. She has not been a parent for these children for almost two and one-half (2 1/2) years. The same facts which support the grounds of abandonment and failure to rehabilitate also support this claim.
"The same evidence certainly can establish more than one ground for termination." In re Shannon S., supra, p. 157. CT Page 2625
Ms. Smith has omitted being a parent to her children by failing to visit them on a regular basis, failing to acknowledge birthdays and holidays, failing to provide necessaries, failing to make regular inquiries about them, and failing to maintain regular communication with DCYS.
She has denied her children a home by acts of omission and commission, as she has not maintained steady employment; she has not maintained a home for her children, she has not successfully completed a drug and alcohol program; she has not complied with the provisions of the social service agreements. Since the children were placed in August, 1988, Ms. Smith has omitted being a parent to them and has ignored all of her parental obligations and responsibilities for their care.
The Petitioner has proven, by clear and convincing evidence, that Anthony, Jennifer and Jacqueline have been denied by acts of commission or omission, the care, guidance and control necessary for their well-being.
The Petitioner also alleges as to all three children, that there is no ongoing parent-child relationship, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the children. Conn. Gen. Stat. 17-43a(b)(4).
The absence of a parent-child relationship contemplates situations where a child has never known her or his parents so that no relationship ever developed between them or where the child has definitely lost that relationship so that despite its former existence, it now has been completely displaced. (citations omitted). As initially stated in decisional law, proof of a lost or displaced relationship depended upon whether the child had present memories or feelings for the natural parent. (citations omitted). Later decisions have narrowed the initial test. At the present time, the terms `memories of' and `feelings for' refers to specific memories and positive feelings." (citations omitted). In re Shannon S., supra, 158-159.
While the children know that Veronica Smith is their mother, their relationship with her is not a positive one, and it has deteriorated over the years.
The children became increasingly disturbed and upset by CT Page 2626 telephone calls from their mother, and unfettered telephone contact was curtailed, by court order in April, 1990. The children have expressed displeasure and disappointment with their mother. The last visits have been disorderly and disruptive for the children. The children have expressed their desire to live with their foster family.
If the court determines that grounds exist for the termination of parental rights, it then goes on to determine whether there is clear and convincing evidence that it would be in the best interest of the child to terminate parental rights. In re Christine F., 6 Conn. App. 360, 363, n. ; 17-43a-(b), Connecticut General Statutes. In order to determine if the termination of parental rights is in the best interest of the child under this statute, the court is required to consider and make written findings on the six factors in 17-43a(d). In re Christine F., supra.
A finding that a statutory ground for termination has been established, does not automatically require the termination of parental rights; there must also be proof by clear and convincing evidence that such termination is in the best interest of the child. Since complete severance by court order of the legal relationship, with all its rights and responsibilities between the child and a parent is a most serious and sensitive judicial action, the natural rights of parents and their children are to be given deference and, absent a powerful countervailing interest, protection. In re Juvenile Appeal (84-5), supra, 707; In re Juvenile Appeal (Anonymous), 181 Conn. 638, 640.
The court's conclusions that statutory grounds for termination have been proven against both parents means that the dispositive phase of the litigation can be considered. Proof of one or more grounds does not bring forth an order of termination as an automatic result. In re Juvenile Appeal (83-BC),189 Conn. 65, 79 (1983). To warrant a destruction of the parent-child relationship, the court must also find from clear and convincing evidence that a termination of parental rights is in the best interest of the children. In re Nicolina T.,9 Conn. App. 598, 602 (1987). As previously mentioned, the court, in the dispositive phase, can consider facts and events occurring after the filing of the petitions and until the end of the trial.
"For the second prong, the determining factor is the child's best interest. (citation omitted). The court is required to look to the future and determine whether it would be detrimental to the child's best interest to allow additional time for a parent-child relationship to develop. " In re Shannon S., supra, 160. CT Page 2627
The testimony by Loretta Jay of DCYS was uncontroverted that to allow further time for the parent-child relationship to develop, it would be detrimental and it is now in their best interest to free them for adoption by the foster family, where they have resided continuously for almost two and one-half (2 1/2) years.
The evidence presented is clear and convincing that there is presently no ongoing parent-child relationship, and that to allow further time for such a relationship to develop would be detrimental to the best interests of the children.
Finally, the grounds for termination have existed for more than one year. The children have been in care since August, 1989, and have been committed to DCYS since March 2, 1989.
C.G.S. 17-43a(d) states that in determining whether to terminate parental rights the court shall consider and make written findings regarding: (1) the timeliness, nature and extent of services offered or provided to the parent and child to facilitate reunion of child with parent; (2) the terms of any applicable court order entered into and agreed upon by the agency and the parent and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child to the parent, guardian and any other person who has cared for the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of the effort to reunite parent and child, provided the Court may give weight to incidental visitation, communications, or contributions and (B) the maintenance or regular contact or communication with the child's guardian, and (6) the extent to which the parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child or any other person, or economic circumstances of the parent.
1. C.G.S. 17-43a(d)(1). In considering the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent, the court finds the following by clear and convincing evidence:
The agency accepted the voluntary placement of Ms. Smith's CT Page 2628 children August, 1988 and provided care for them until they were committed in March, 1989. DCYS provided a service agreement with Ms. Smith in August, 1988, to outline what Ms. Smith needed to accomplish to have her children returned. DCYS provided visitation for Ms. Smith with her children, and delayed filing neglect petitions until January, 1989, with the expectation that Ms. Smith could have her children returned. After the children were committed, DCYS continued to maintain the children together in one foster home. DCYS permitted telephone contact between Ms. Smith and her children, until that privilege was abused by Ms. Smith. DCYS prepared three more social service agreements to assist Ms. Smith in understanding her obligations. Ms. Jay of DCYS offered services to Ms. Smith regarding referrals to agencies for drug and alcohol rehabilitation, as well as psychological services. DCYS offered bimonthly scheduled visits with the children for Ms. Smith and offered assistance with transportation. Ms. Jay was always available to Ms. Smith for support services and for referrals to other agencies. Ms. Jay visited Ms. Smith at Hall-Brooke, and brought the children for a visit. After the filing of the TPR petition, the agency offered a final service agreement and continued to provide visits between Ms. Smith and her children. Ms. Jay continued to provide assistance to Ms. Smith for services.
2. C.G.S. 17-43a(d)(2). In considering the terms of any applicable court order entered into and agreed upon by any individual agency and the parent, and the extent to which the parties have fulfilled their obligations under such order, the court finds the following by clear and convincing evidence:
In March, 1989, at the time of the commitment, Ms. Smith was awarded liberal telephone contact with her children. She abused this privilege, to the point of upsetting her children sufficiently, so that in April, 1990, the court curtailed telephone contact. Ms. Smith signed a social service agreement for the express purpose of resuming telephone contact. She failed to comply with that agreement. The provisions of the final service agreement were filed with the court and the mother was ordered, on July 20, 1990, to comply with those provisions. The mother did not comply with the provisions of that agreement. The agency continued to offer and provide supervised visits between Ms. Smith and her children, even through the final days of the trial.
3. C.G.S. 17-43a(d)(3). In considering the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom such child has developed significant emotional ties, CT Page 2629 the court finds by clear and convincing evidence, the following:
Anthony, Jennifer and Jacqueline have all expressed their desire to Live with their foster family. They are disappointed and upset with their mother. They became significantly disturbed by the telephone calls from their mother, and those calls were curtailed. Their recent visits have been chaotic and the children have been unruly while with their mother. The relationship between Ms. Smith and her children has deteriorated significantly, since their placement in foster care, and the relationship between the children and their foster family has grown and strengthened.
4. C.G.S. 17-43a(d)(4). In considering the ages of the children, the court finds that Anthony is nearly nine years old; Jennifer and Jacqueline are over six (6) years old. They have spent more than two and one-half (2 1/2) years in foster care, and need to have their lives settled.
5. C.G.S. 17-43a(d)(5). In considering the efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child, the court finds by clear and convincing evidence, the following:
When the children were placed in care, Ms. Smith was homeless and unemployed. Two and one-half (2 1/2) years later, Ms. Smith continues not to have adequate housing for the children and is still unemployed. She has done absolutely nothing in two and one-half years to change her situation in life. She has failed to comply with four social service agreements; she was arrested and is on probation for an assault charge; she entered Norwalk Hospital several times for drug and alcohol detox and spent three weeks at Hall-Brooke, but then failed to follow through with any drug rehabilitation program and has failed to maintain sobriety. She saw her children for a total of five (5) hours in 1989 and ten (10) hours in 1990, even missing a scheduled visit during the trial. She has failed to maintain regular contact with DCYS and has been whereabouts unknown for extended periods of time. She has failed to acknowledge holidays and birthdays and did not see her children at Christmas, 1988 or 1989.
6. C.G.S. 17-43a(d)(6). In considering the extent to CT Page 2630 which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence, the following:
Ms. Smith has never been prevented from maintaining a relationship with her children. In fact, DCYS has always pressed Ms. Smith to visit and maintain contact with her children. It has been Ms. Smith who has missed or cancelled visits, or failed to schedule visits. The only time Ms. Smith mentioned financial problems was once when she said she did not have $3.00 for train fare. She was, at that time, employed at UPS, earning $9.00 per hour. She did not ask DCYS for transportation assistance, nor did she ask her friends for help. It was not until the end of trial when Ms. Smith indicated that Mr. Dudley was the father of Anthony. There was no evidence that she was prevented by anyone from maintaining a meaningful relationship with any of the children.
Taking all required factors into account, the court concludes that the requested termination of parental rights has been proved by clear and convincing evidence to be in the best interest of the children. A termination is therefore ordered for the parental rights of Veronica Smith in and to her minor children, Anthony, Jennifer and Jacqueline.
Pursuant to General Statutes 17-43a-(f), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Anthony, Jennifer and Jacqueline can be placed in adoption. DCYS is required to submit reports to the Clerk of the Court within 90 days of the date of this judgment and every six months thereafter until the adoptions of Anthony, Jennifer and Jacqueline are finalized.
Entered at Norwalk this 26th day of March, 1991.
COCCO, J.