******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* MADELINE GRIFFIN
## (AC 40555)

Sheldon, Keller and Lavery, Js.

*Syllabus*

Convicted of the crimes of arson in the first degree, conspiracy to commit arson in the first degree and insurance fraud, the defendant appealed, claiming that the evidence was insufficient support her conviction and that the trial court improperly denied her motion to suppress certain pretrial and in-court identifications of her that were made by witnesses to the fire. The defendant's conviction resulted from an arson at her mother's home after which the defendant's mother filed a homeowner's insurance claim for damage to her home. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's motion to suppress the identifications of her that were made to the police and in court by witnesses to the fire; the photographic arrays that the police administered to the witnesses were not unduly suggestive, as the defendant did not appear to be substantially different in age or appearance from the other women in the arrays and did not appear to be highlighted, even though she was smiling slightly in her photograph, her claim that there was an increased risk that the witnesses would select her photograph because the photographs were administered simultaneously instead of sequentially was unavailing and not borne out by appellate precedent, and this court having concluded that the arrays and procedures employed in administering them were not unconstitutionally suggestive, it was not necessary to address the defendant's claim that the identifications were unreliable, and her claim regarding the suppression of the in-court identifications, having been premised entirely on her claims that the pretrial identifications of her were suggestive and unreliable, also failed.

2. The defendant could not prevail on her claim that the evidence was insufficient to support her conviction of arson in the first degree and conspiracy to commit arson in the first degree, which was based on her assertion that there was no evidence that she started the fire with the intent to collect insurance proceeds related to the homeowner policy; a reasonable jury could have inferred from the circumstantial evidence that the defendant's conduct was part of a plan to defraud and that she possessed the requisite intent when she started the fire, as the evidence supported a finding that her mother filed an insurance claim for the property damage, that the defendant, prior to lighting the fire, stowed valuables that belonged to her and her mother in her car, and that her mother packed items in her own car and made arrangements to be away from her home when the defendant started the fire, and the defendant's claim that the evidence was insufficient to establish that she possessed the requisite mens rea to support the conspiracy conviction was unavailing, as there was sufficient evidence to support the inference that she possessed the requisite intent to commit the arson.

3. The defendant's conviction of insurance fraud as to her mother's fraudulent insurance claim could not stand, as there was no evidence that the defendant participated in the making or preparation of any statement that was provided to her mother's home insurer; the plain and unambiguous terms of the insurance fraud statute (§ 53a-215 [a] [2]) require evidence that the defendant engaged in conduct related to the making or preparing of the insurance claim, and the same evidence that supported her arson conviction could not be used to uphold her insurance fraud conviction, as that evidence, which supported an inference that the defendant intended to defraud when she started the fire, did not reasonably support the inference that she engaged in the making or preparation of the actual statement given to the insurance company.

Argued April 25—officially released September 11, 2018

*Procedural History*

Substitute information charging the defendant with

two counts of the crime of insurance fraud, and with the crimes of arson in the first degree and conspiracy to commit arson in the first degree, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Pavia, J.*; thereafter, the court denied the defendant's motion to suppress certain evidence; verdict and judgment of guilty, from which the defendant appealed. *Reversed in part; judgment directed; further proceedings.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *David R. Applegate*, assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Madeline Griffin, appeals from the judgment of conviction, rendered after a jury trial, of one count each of the crimes of arson in the first degree in violation of General Statutes §§ 53a-100, 53a-111 (a) (3) and 53a-8 (a); conspiracy to commit arson in the first degree in violation of General Statutes §§ 53a-48 (a), 53a-100 and 53a-111 (a) (3); insurance fraud in violation of General Statutes § 53a-215 (a) (1); and insurance fraud in violation of General Statutes § 53a-215 (a) (2). On appeal, the defendant claims that (1) the trial court improperly denied her motion to suppress the pretrial and in-court identifications of her because they were the result of unnecessarily suggestive photographic arrays, and (2) the state presented insufficient evidence to convict her of arson, conspiracy to commit arson, and the insurance fraud charge pertaining to the homeowner's insurance policy of her mother. We agree with the defendant's second claim as it pertains to the insurance fraud count and, accordingly, reverse in part the trial court's judgment. We otherwise affirm the judgment.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. At about 2:45 p.m. on May 28, 2011, the defendant set fire to her mother's house in Stratford. Neighbors, including Carmen Febles, Juan Febles, and Karen Wakeley, heard an explosion and saw flames coming from the house. The defendant appeared among the neighbors, barefoot, claiming that she had been mowing the lawn when the fire started. At least one of the neighbors was familiar with the defendant. The defendant, who spoke English and Spanish, identified herself as the homeowner's daughter, and then used Carmen Febles' cell phone to call her mother's cell phone and asked the person on the other line, "Where are you?" Approximately thirty minutes later, two unidentified individuals drove to the scene, picked up the defendant, and drove away.

Meanwhile, emergency personnel arrived at the scene to extinguish the fire and investigate its origins. They determined that the fire was started intentionally through the use of gasoline as an accelerant. A K-9 unit alerted to several areas of the house where an accelerant was used, and a partially melted gasoline container was found in the house. At about the same time, a tracking K-9 searched the neighborhood. Another neighbor, Debra Hirth, who had not witnessed the fire, alerted an officer to a pair of sandals smelling of gasoline that appeared to have been thrown onto her property. The sandals were then presented to the other K-9 unit, which alerted to the sandals as containing accelerants.

The defendant returned to the scene while police

were still there and voluntarily provided a written statement to police. She claimed to have been at her home in Danbury during the fire, but had left her car parked in her mother's garage. The following items were found inside her car: a cell phone; two televisions; trophies; frozen and canned food; a safe containing multiple valuables and documents, including the mother's marriage license and jewelry; and a pocketbook containing the defendant's passport, multiple identification cards, and multiple social security cards.

The defendant later filed an insurance claim with Esurance for damage to her car. The defendant's mother filed an insurance claim with Homesite Insurance Company (Homesite) for damage to the house.

Carmen Febles and Juan Febles met with police on May 31, 2011, and gave statements concerning their encounter with the defendant on the day of the fire. Stratford police separately administered photographic arrays to Carmen Febles and Juan Febles. Both identified the defendant as the woman they encountered at the fire scene. Wakeley likewise gave a statement to police, and also identified the defendant in a photographic array as the woman she talked to at the fire scene.

In an amended information, the state charged the defendant with arson in the first degree as a principal and an accessory, conspiracy to commit arson in the first degree, and two counts of insurance fraud. Prior to trial, the defendant filed a motion to suppress the pretrial identifications made by the Febleses and Wakeley, and sought to prevent them from making in-court identifications. The court denied the motion.

After a jury trial, the defendant was convicted on all counts. The defendant was sentenced to a total effective term of twenty years of incarceration, execution suspended after twelve years, and five years of probation. One of the conditions of the defendant's probation was that she pay $337,000 in restitution to the insurer of her mother's home, Homesite Insurance Company. This appeal followed.

I

The defendant first claims that the court improperly denied her motion to suppress identifications made by the Febleses and Wakeley. Specifically, the defendant argues that the identification procedure used by police was suggestive and unreliable, and, therefore, the trial court should have suppressed the pretrial and in-court identifications of the defendant by these witnesses. We are not persuaded.

The following additional facts are relevant to the present claim. As we stated previously in this opinion, prior to trial, the defendant filed a motion to suppress evidence of pretrial identifications made by Carmen Febles, Juan Febles, and Wakeley. Additionally, she

asked the court to prevent these witnesses from making in-court identifications. On October 29, 2015, the court held a hearing on the defendant's motion at which it heard testimony from two Stratford police officers, Edward Leary and Lawrence Overby, and a Milford police officer, Bruce Carney.[1] All three witnesses were shown arrays consisting of the same eight photographs appearing on a single sheet of paper, although the arrangement of the photographs in each array was different. The cover sheet attached to each array was identical, each cover sheet reflected the witness' sworn statement that he or she had identified the person he or she had encountered at the fire scene, and each cover sheet contained instructions that had been initialed by each witness.[2]

Leary testified in relevant part that he administered the photographic array to Carmen Febles. He lacked a recollection of the circumstances surrounding the array, but, relying on the array and the cover sheet attached to it, he testified that he had administered the array to Carmen Febles, that he followed standard police procedures for administering the array, and that Carmen Febles had identified the defendant. He testified that it would have been the normal practice for the Stratford police to have had two officers present during the administration of the array. Moreover, Leary testified that standard police procedure would entail his reading the instructions on the cover sheet to the witness and having the witness sign his or her initials next to each instruction. He stated his belief that this procedure was followed with Carmen Febles because the cover sheet attached to the array reflected the witness' initials next to each instruction set forth thereon, and his signature appeared on the cover sheet, indicating that the witness swore before him that she understood the instructions and had identified the person selected from the array as the person she had encountered at the fire scene. Leary testified that the standard instructions indicated that a suspect may or may not be depicted in the array. Leary asserted that he would have followed protocol in administering the array and would not have directed Carmen Febles to choose any particular photograph. Leary also testified that Carmen Febles indicated her understanding of the instructions, and had selected the defendant's photograph from those appearing in the array by circling the defendant's photograph and signing her name near it.

Overby testified at the suppression hearing that he took part in administering the photographic array to Juan Febles. Overby testified that although another police officer, Jeff Nattrass, had administered the array to Juan Febles, he nonetheless "notarized" Juan Febles' statement that appears on the cover sheet of the array that the photograph he had selected was that of the person he had observed at the fire scene. Overby testified that, in accordance with standard police procedure,

the cover sheet of the array reflects that Juan Febles had initialed next to each of the standard array instructions, one of which stated that "[t]he person you saw may or not be in the photograph." Moreover, the array reflected that Juan Febles circled the defendant's photograph in the array and signed his name near the photograph. The cover sheet reflects the defendant's signature as well as Overby's signature, as evidence that Febles had made a sworn statement to him concerning the array.

Carney testified that, at the request of the Stratford police, he constructed the arrays shown to the Febleses. He was provided the defendant's name and date of birth. Carney retrieved the driver's license photograph of the defendant that the Milford police already had in their possession, and he searched for photographs in Milford's police database that depicted females who were similar in age, race, and facial features to the defendant. Carney then changed the defendant's photograph to black and white, so that its background matched the backgrounds in the seven other photographs in the array consisting of mug shots in the Milford police database.

At the hearing, the defendant argued that the array was unduly suggestive. She argued that only one other woman in the array appeared to be of the defendant's age, that the witnesses were shown the photographs simultaneously as opposed to sequentially, that the defendant's photograph stood out because she was smiling, and that, in composing the array, Carney did not obtain photographs by relying on physical features identified by the witnesses, but instead relied on the driver's license photograph alone to select the other photographs.

The state countered in relevant part that the array contained eight different photographs, that the defendant's photograph was not highlighted, that the witnesses were instructed that a suspect might not be in the array, and that the witnesses were not shown multiple arrays with the defendant's photograph appearing in each array. Also, although Carney used a photograph of the defendant that depicted her without curly hair, contrary to the description of the suspect by the witnesses, the state argued that all three witnesses were instructed that "persons in the photos may not look exactly like they did on the date of the incident . . . ."

The court, noting that "the defendant ha[d] the burden of proving that the identification[s] resulted from an unconstitutional procedure," found that the defendant failed to prove that the arrays were suggestive. The court rejected the defendant's arguments that the array had highlighted the defendant and relied on the police officers' testimony concerning the procedures employed. The court stated that it did not agree with the defendant that her age and appearance were sub-

stantially different from those of the other persons depicted in the array. The court, therefore, denied the motion to suppress.

At trial, Carmen Febles, Juan Febles, and Wakeley testified about the manner in which they selected the defendant in photographic arrays that the police had administered to them prior to the time of trial, and the completed arrays were presented in evidence. Each of these witnesses testified that the police had provided them with instructions and that they had identified the person that they had encountered at the scene of the fire. Moreover, each of these witnesses made an in-court identification of the defendant.

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . .

"In the seminal case of *Neil* v. *Biggers*, [409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)], the [United States] Supreme Court explained the overarching concern that courts face when assessing a challenged identification procedure: It is . . . apparent that the primary evil to be avoided is a very substantial likelihood of irreparable misidentification. . . . It is the likelihood of misidentification which violates a defendant's rights to due process . . . . Id., 198, quoting *Simmons* v. *United States*, [390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)]. As courts apply the two-pronged test to determine if a particular identification procedure is so suggestive and unreliable as to require suppression, they always should weigh the relevant factors against this standard. In other words, an out-of-court eyewitness identification should be *excluded* on the basis of the procedure used to elicit that identification *only* if the court is convinced that the procedure was so suggestive *and* otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification. See *Simmons* v. *United States*, supra, 384." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 141–42, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

"[A] claim of an unnecessarily suggestive pretrial identification procedure is a mixed question of law and fact [subject to plenary review]. With respect to our review of the facts . . . because the issue of the suggestiveness of a photographic array implicates the defendant's constitutional right to due process, we undertake a scrupulous examination of the record to ascertain whether the findings are supported by sub-

stantial evidence." (Internal quotation marks omitted.) Id., 137.

"[W]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether [identification evidence] should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Salmond*, 179 Conn. App. 605, 616, 180 A.3d 979, cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018).

"The critical question . . . is what makes a particular identification procedure 'suggestive' enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . There are . . . two factors that courts have considered in analyzing photographic identification procedures for improper suggestiveness. The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. See, e.g., *State* v. *Williams*, [203 Conn. 159, 176, 523 A.2d 1284 (1987)] (multiple photographs of same individual in same or subsequent photographic arrays possibly suggestive 'when, in the context of the entire array, the recurrence unnecessarily emphasizes the defendant's photograph'); *State* v. *Fullwood*, [193 Conn. 238, 247, 476 A.2d 550 (1984)] (to be unnecessarily suggestive, variations in array photographs must highlight defendant to point that it affects witness' selection); *State* v. *Gold*, 180 Conn. 619, 656, 431 A.2d 501 ('[when] a feature is placed on the defendant's photograph in order to make the picture conform to the witness' description of the criminal he or she had seen, the identification proceeding has been held to have been rendered highly suggestive'), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); see also *United States* v. *DeCologero*, [530 F.3d 36, 62 (1st Cir.)] (at first step in two-pronged test, court 'consider[s] whether the photo[graphic] array included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect') [cert. denied, 555 U.S. 1005, 129 S. Ct. 513, 172 L. Ed. 2d 376, cert. denied, 555 U.S. 1039, 129 S. Ct. 615, 172 L. Ed. 2d 469 (2008)]; *United States* v. *Rattler*, 475 F.3d 408, 413 (D.C. Cir. 2007) (court must 'examine the suggestivity of irregularities between the subjects in the array').

"The second factor, which is related to the first but conceptually broader, requires the court to examine

the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer. See, e.g., *State* v. *Fullwood*, supra, 193 Conn. 248 (irregularity in defendant's photograph not suggestive because it did not 'signal to the witnesses that the defendant was the person whom the police believed to be the perpetrator of the robbery'); see also *Simmons* v. *United States*, supra, 390 U.S. 385 ('[t]here is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the [law enforcement] agents in any other way suggested which persons in the pictures were under suspicion'); *State* v. *Ledbetter*, 185 Conn. 607, 612, 441 A.2d 595 (1981) (no basis for claiming that 'display itself was suggestive or that [the administering officer] was suggestive in any respect in the selection process'); *State* v. *Gold*, supra, 180 Conn. 656 ('[a] procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police' . . .)". (Citation omitted; footnote omitted.) *State* v. *Marquez*, supra, 291 Conn. 142–44.

Our Supreme Court also stressed "that this is *not* a 'best practices' test. In other words, the test does not require a court to engage in a relative value judgment of various possible identification techniques and settle on the one that it believes bears the least risk of mistake, a decision that would be prone to being revised or second-guessed as the scientific debate evolves and new studies become available. See, e.g., *State* v. *Nunez*, 93 Conn. App. 818, 832, 890 A.2d 636 (2006) ('[t]he question . . . is not whether a double-blind, sequential identification procedure is less suggestive than the traditional procedures . . . but . . . whether the traditional procedures are unnecessarily suggestive under [the] constitution'), cert. denied, 278 Conn. 914, 899 A.2d 621, cert. denied, 549 U.S. 906, 127 S. Ct. 236, 166 L. Ed. 2d 186 (2006); see also *State* v. *Fullwood*, supra, 193 Conn. 244 ('[i]t has been generally recognized that the presentation of several photographs to witnesses, including that of the suspect . . . is by itself a nonsuggestive and constitutionally acceptable practice, in the absence of any unfairness or other impropriety in the conduct of the exhibit' . . .). Nor does this test require law enforcement personnel to alter their procedures every time a fresh scientific study suggests that a new identification procedure might lead to more reliable

results. Moreover, although our analysis focuses principally on two key functional aspects of the eyewitness identification process, we stress that it is the *entire* procedure, viewed in light of the factual circumstances of the individual case, that must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed." (Emphasis in original; footnote omitted.) *State* v. *Marquez*, supra, 291 Conn. 145–46.

"In evaluating the suggestiveness of a photographic array, a court should look to both the photographs themselves and the manner in which they were presented to the identifying witness. . . . We consider the following nonexhaustive factors in analyzing a photographic array for unnecessary suggestiveness: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array. . . . It is important to note, however, that [p]hotographs will often have distinguishing features. The question . . . is not whether the defendant's photograph could be distinguished from the other photographs . . . but whether the distinction made it unnecessarily suggestive." (Citations omitted; internal quotation marks omitted.) Id., 161.

We conclude that the photographic arrays administered to the witnesses were not suggestive. First, we address the defendant's arguments that the arrays were composed in such a manner that they unfairly highlighted her. The court considered the defendant's argument that she appeared to be a different age than the majority of the people in the array. The court, however, found that the defendant did not appear "to be substantially different in age or appearance from the other individuals who are in the array. . . . [T]he array was made in black and white so as not to highlight the defendant . . . ." The defendant also argues that her photograph in the array is the only photograph that depicts someone smiling. To be unnecessarily suggestive, a variation must highlight the defendant to the point that it affected the witnesses' selection of the defendant. See *State* v. *Fullwood*, supra, 193 Conn. 247; see also *State* v. *Marquez*, supra, 291 Conn. 143. After

our own scrupulous review of the array, we are not persuaded that the defendant looks so different from the other women in the array so as to make the array unduly suggestive. Some, but not all, of the photographs in the arrays depict females with what may be described as neutral facial expressions. In her photograph, the defendant appears to be smiling slightly but, similar to the appearance of the other females depicted in the array, her teeth are not visible. Our careful examination of the arrays does not lead us to conclude that the defendant appears to be highlighted in the array or that she was dissimilar to the other females depicted therein. Thus, our examination of the arrays does not lead us to conclude that the court erred in finding that the photographs used were not so dissimilar that they rendered the arrays suggestive.[3]

The defendant also argues that there was an increased risk that the witnesses would select the defendant's photograph because the photographs were administered simultaneously instead of sequentially.[4] In *State* v. *Marquez*, supra, 291 Conn. 156, our Supreme Court opined that "this continues to be an issue particularly ill suited to generic, bright line rules," and that "[d]ue process does not require the suppression of a photographic identification that is not the product of a double-blind, sequential procedure." (Internal quotation marks omitted.) The defendant, quoting from *State* v. *Guilbert*, 306 Conn. 218, 238, 49 A.3d 705 (2012), argues that "identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure . . . ."[5]

There are two problems with the defendant's argument. As this court noted in *State* v. *Grant*, 154 Conn. App. 293, 311, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015), "[t]he principal issue before the court in *Guilbert* was not whether any particular identification procedures are constitutionally mandated, but whether courts are obligated to admit under specified circumstances qualified expert testimony concerning the fallibility of eyewitness identification under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to aid juries in their evaluation of identification evidence." The second problem is that the quotation from *Guilbert* that the defendant cites, by its very terms, pertains to *reliability*, not *suggestiveness*. Therefore, the defendant's argument that the police officers' use of simultaneous photographic arrays was suggestive is not borne out by our appellate precedent.

Considering the totality of the circumstances after our scrupulous review, the photographic arrays and the procedures employed in administering them were not unconstitutionally suggestive.[6] Therefore, we do not address the defendant's claim regarding reliability. See

*State* v. *Outing*, 298 Conn. 34, 56, 3 A.3d 1 (2010) (our Supreme Court "consistently has declined to consider the reliability of the identification if [it concludes] that the procedure was not unnecessarily suggestive"), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Additionally, because the defendant's claim regarding suppression of the witnesses' in-court identifications is entirely premised on her claim that the pretrial identifications were suggestive and unreliable, it, too, must fail. Thus, the court did not abuse its discretion in denying the motion to suppress.

II

The defendant also claims that the state failed to meet its burden of proof on the elements of three of the crimes of which she was convicted, namely, that the state failed to meet its burden of proof on the arson charge, the conspiracy to commit arson charge, and the insurance fraud charge pertaining to her mother's insurance claim for the home.[7] Specifically, the defendant contends that there was no evidence that she was connected to the homeowner's insurance claim or in any way benefited from it. The defendant also argues that the state bore the burden of proving that she intended to collect insurance proceeds in order to convict her of the arson and conspiracy to commit arson counts, and failed to present sufficient evidence in this regard. We agree with the defendant that the state failed to present sufficient evidence to prove that she committed insurance fraud, but disagree that, in order to be convicted of arson or conspiracy to commit arson, she must have intended to benefit from any insurance proceeds.

The defendant seeks review of her claims of insufficient evidence under the doctrine of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015); however, "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding* . . . . [Thus] we review an unpreserved sufficiency of the evidence claim as though it had been preserved." (Internal quotation marks omitted.) *State* v. *Josephs*, 328 Conn. 21, 35 n.11, 176 A.3d 542 (2018).

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 131,      A.3d      (2018).

### A

We first address the defendant's claim that there was insufficient evidence to convict her of arson. Specifically, the defendant argues that her conviction should be vacated because "there was no evidence that [the] defendant intended to collect insurance proceeds from damages to the home." We disagree.

General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined insection 53a-100,[8] he starts a fire or causes an explosion, and . . . (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss . . . ." (Footnote added.) Thus,

to obtain a conviction, the state needed to prove beyond a reasonable doubt that the defendant (1) started the fire (2) to destroy her mother's home (3) with the "intent to defraud" an insurance company. *State* v. *Woodson*, 227 Conn. 1, 9, 629 A.2d 386 (1993). The defendant does not challenge the fact that the state presented evidence that she started the fire or that the fire was intended to destroy her mother's home. Instead, the defendant argues that there was no evidence that she had she started the fire with the intent of collecting insurance proceeds related to the homeowner policy.

The defendant must have the specific intent to defraud in order to be guilty pursuant to § 53a-111 (a) (3). *State* v. *Joyce*, 243 Conn. 282, 298–99, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). Specific intent is usually proven by circumstantial evidence. *State* v. *Williams*, 169 Conn. 322, 334, 363 A.2d 72 (1975). Our Supreme Court has recognized that "intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . [A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded [on] the evidence." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 657–58, 1 A.3d 1051 (2010).

The record supports a rational inference that the defendant acted with the specific intent to defraud because of evidence that the defendant and her mother acted in concert before, on the day of, and after the fire. The evidence supported the finding that the defendant's mother filed an insurance claim for the property damage caused by her daughter. Prior to lighting the fire, the defendant stowed valuables belonging to both her and her mother in the trunk of her car. There was also evidence that the defendant's mother packed items in her own car and made arrangements to be away from her home when the defendant started the fire. This culmination of the circumstantial evidence could lead a reasonable jury to infer that the defendant did not start the fire simply to destroy her mother's home, but that the defendant's conduct was part of a plan to defraud and that she possessed the requisite intent when she started the fire.

The defendant also challenges her conspiracy conviction on the limited ground that the evidence was insufficient to establish that she possessed the requisite mens rea for the underlying crime. Because of our conclusion that the defendant acted with an intent to defraud, however, there is sufficient evidence to support the inference that the defendant possessed the requisite intent to commit the arson.

B

We finally address the defendant's claim that there was insufficient evidence that she violated § 53a-215 (a) (2). Specifically, she argues that the insurance fraud statute required the state to prove that she assisted or conspired with another to make or prepare a statement in connection with her mother's fraudulent insurance claim and that the state presented no evidence in this regard. We agree with the defendant.

Section 53a-215 (a) provides in relevant part: "A person is guilty of insurance fraud when the person, with the intent to injure, defraud or deceive any insurance company . . . (2) assists, abets, solicits, or conspires with another to *prepare or make any written or oral statement* that is intended to be presented to any insurance company in connection with, or in support of, any application for any policy of insurance or any claim for payment or other benefit pursuant to such policy of insurance, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such application or claim for the purposes of defrauding such insurance company." (Emphasis added.)

As there is no precedent from this court or our Supreme Court interpreting the meaning of § 53a-215 (a) (2), our resolution of this portion of the defendant's claim becomes an issue of statutory interpretation. "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Footnote omitted; internal quotation marks omitted.) *State* v. *Leak*, 297 Conn. 524, 532–33, 998 A.2d 1182 (2010). "Issues of statutory construction raise questions of law, over which we exercise plenary review." (Internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 13, 981 A.2d 427 (2009).

Per the plain and unambiguous terms of § 53a-215 (a) (2), in order to establish guilt, the state must present evidence that the defendant engaged in conduct related to the making or preparing of the insurance claim. We agree with the state that this does not require evidence of physically filing the claim. We disagree with the state's argument, however, that the same evidence that supports the defendant's arson conviction can be used

to uphold her insurance fraud conviction. Although this evidence supports the inference that the defendant intended to defraud when she started the fire, it does not reasonably support the inference that she engaged in the making or preparation of the actual statement given to Homesite. Ultimately, after a thorough review of the record, we conclude that there is no evidence that the defendant participated in the making or preparation of any statement provided to Homesite. Thus, the defendant's conviction under § 53-215 (a) (2) cannot stand.

The judgment is reversed only with respect to the defendant's conviction of insurance fraud under § 53a-215 (a) (2) and the case is remanded with direction to render a judgment of acquittal on that charge and to resentence the defendant on the conviction of arson in the first degree, conspiracy to commit arson in the first degree and insurance fraud in violation of § 53a-215 (a) (3); the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The state did not present testimony from the police officer who administered the array to Wakeley. Nonetheless, the array and cover sheet that were completed by Wakeley and the officer who administered the array to her were before the court.

[2] The instructions provided: (1) "I will ask you to review a set of photographs," (2) "It is important to clear innocent people and to identify the guilty," (3) "Persons in the photos may not look exactly as they did on the date of the incident, because of features like facial or head hair change," (4) "The person you saw may or may not be in the photograph," and (5) "The Police will continue to investigate this incident, whether you identify someone or not."

[3] The defendant cites to one case from this court and several out-of-state cases for the proposition that when the constituent photographs of an array contain individuals with disparate ages than that of the defendant, the array is suggestive. See *State* v. *Small*, 1 Conn. App. 584, 587–88, 474 A.2d 460 (1984); see also *United States* v. *Wade*, 388 U.S. 218, 232, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *United States* v. *Castro-Caicedo*, 775 F.3d 93, 98 (1st Cir. 2014), cert. denied, U.S. , 135 S. Ct. 1884, 191 L. Ed. 2d 753 (2015); *Swicegood* v. *Alabama*, 577 F.2d 1322, 1327–28 (5th Cir. 1978); *State* v. *Merrill*, 22 Ohio App. 3d 119, 122, 489 N.E.2d 1057 (1984). These cases generally note the actual variations in ages among those persons presented to a witness (or, at the very least, a finding by the trial court that a suspect was far older than the others presented). The defendant, however, made no showing, in the trial court or here, that there was *any* variation in the ages of the women in the array, relying exclusively on her argument that they *appear* different, which the trial court reasonably did not find.

[4] The arrays each contained eight photographs, but "[t]he police officers' use of an eight person photographic array is not, in and of itself, impermissibly suggestive." *State* v. *Smith*, 107 Conn. App. 666, 674, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

[5] There was never any discussion before the trial court as to whether the arrays were administered using a double-blind procedure, but testimony from the suppression hearing indicates that the officer who contacted Carney was also involved in the administration of the array to Juan Febles. Regardless, the defendant has not argued on appeal that the lack of a double-blind procedure resulted in an unduly suggestive array.

[6] Additionally, the evidence presented reflects that the witnesses were all instructed that the suspect might not appear in the array, each was presented only with a single array, and each witness was administered the array separately. Leary testified that he did not attempt to influence the witness' selection, and each witness separately confirmed at trial that no officer attempted to influence his or her selection.

[7] At oral argument before this court, the defendant indicated that she was not claiming that there was insufficient evidence to convict her of the

insurance fraud charge pertaining to her car.

[8] General Statutes § 53a-100 (a) provides in relevant part: "(1) 'Building' in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy. Where a building consists of separate units, such as, but not limited to separate apartments, offices or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building  . . . ."

––––––––––––––––––––––––––––––––